## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**BLUE CHIP ALLIANCE, LLC,**
**dba THE MAN SHOP**

      **Plaintiff,**                 **Case No.**  0:22-cv-61602

**v.**

**CHETU, INC.,**

      **Defendant.**

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

      Plaintiff Blue Chip Alliance, LLC dba "The Man Shop" ("Plaintiff" or "Blue Chip") hereby alleges as follows:

### NATURE OF ACTION

      1.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201 in which Blue Chip seeks a determination that it does not infringe any purported copyrights held by Chetu in certain software applications and/or code under 17 U.S.C. § 501, and that Blue Chip is an authorized licensee of such software applications and code as a matter of contract.

      2.     This is further an action for breach of contract, fraud in the inducement, and unlawful and deceptive business practices arising from Chetu's pattern and practice of inducing customers into paying monthly development fees without either the competency or ability to deliver stable and non-defective software applications to its customers. Plaintiff is informed and believes that it is just one of hundreds of victims of Chetu's fraudulent, unfair, and deceptive business practices.

## PARTIES

3.     Blue Chip is a Washington limited liability company with its principal place of business in Spokane, Washington.  Blue Chip has three members, all of whom reside in the State of Washington.

4.     Chetu is a Florida corporation with its principal place of business in Plantation, Florida.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter on two grounds:

(i)     28 U.S.C. § 1331 and § 1338(a), because this matter arises under the copyright laws of the United States, 17 U.S.C. §§ 501 et seq.; and

(ii)     28 U.S.C. § 1332, because there is complete diversity of citizenship in that Blue Chip and its members are citizens of the State of Washington and Blue Chip's principal place of business is in the State of Washington, whereas Chetu is a citizen of Florida with its principal places of business in Florida, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and in addition to other and further relief, declaratory relief is sought.

6.     Supplemental jurisdiction over the state law claims is also proper in this Court pursuant to 28 U.S.C. § 1367 and the principles of pendent jurisdiction.

7.     Personal jurisdiction over Chetu exists, both as a matter of contract, because Chetu resides in this District, and because some or all of the acts or events giving rise to this action occurred in this judicial district.  *See* Agreement for Software Development and Maintenance Services (hereinafter, "Software Contract"), attached hereto as Exhibit A, Section 11 (Governing Law and Consent to Jurisdiction) ("The parties agree that any suit, action or other legal proceeding arising out of this Agreement shall be brought exclusively in Broward County, Florida.").

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events, omissions, and breach giving rise to Blue Chip's claims, as described herein, occurred in this District, because Chetu resides in this District, and because the contract requires venue exclusively in this District (*See* Exhibit A, Software Contract at Section 11).

**FACTS COMMON TO ALL CAUSES OF ACTION**

9.     Blue Chip owns and operates eleven (11) modern-day barber shops in Washington and Montana.  The key to Blue Chip's success has been its focus on creating the best-in-class experience for its customers from the moment they make a reservation until the moment the finish their experience.  Critical to ensuring customer satisfaction is the integration of modern technological conveniences that enhance the customer experience both through its mobile reservation system and check-in and check-out processes.

10.     In order to enhance its customer experience, Blue Chip launched a search to identify a software development team who could create and/or improve its customer loyalty and scheduling experiences as well as to automate payroll and other administrative matters.  Chetu was one of several software developers considered by Blue Chip to improve Blue Chip's mobile and internal applications.

11.     In early November 2020, one of Blue Chip's managing members, Michael Howe, sent a request for more information to Chetu regarding Blue Chip's desire to retain a developer to assist with making improvements to its various mobile applications and point-of-sale ("POS") system.  On November 11, 2020, Chetu's National Account Manager, David Pridgen, responded indicating Chetu's ability to perform the services requested.  Over the next several weeks, Mr. Howe and Mr. Pridgen engaged in several conversations wherein Mr. Pridgen repeatedly represented that Chetu had the competency to develop the software applications

sought by Blue Chip and that it could develop those applications within a matter of months.

12.     On November 30, 2020, Mr. Howe sent an email to Mr. Pridgen stating that "[w]e are not sure if we are interested in moving ahead with you on the app development, it is something we are still looking at."  At the time, Blue Chip was in discussions with another developer as a point of comparison with Chetu.

13.     Eager to secure a sale, Mr. Pridgen suggested in an email to Mr. Howe that same day that Mr. Howe speak with Chetu's Director of Operations who could "give you a timeline estimate on how long it would take to develop, and ultimately the cost."  Mr. Pridgen further repeated his prior oral representations to Mr. Howe: "Remember, you aren't just receiving a dedicated developer, but also a team lead, QA, UI/UX and a technical project manager. With our low rates and honestly low margins, we require all engagements to be three months long. Obviously, the mobile app build would take a short while longer than that."

14.     On January 4, 2021, Mr. Howe responded to Mr. Pridgen as follows:

> "I am open to meeting with your DO regarding having one of your team members join us for some additional feature developments of our current POS. Which would include setting up integration API's with our current payroll provider (Paychex.) The goal will be to have payroll be completely automated and uploaded to their system once we verified it is correct on our end. We also are looking to integrate our credit card processing directly into our POS, our credit cards are processed through Heartland. If these projects are accomplished in a timely fashion and the work is quality, then we would look to have this person work on the loyalty app development.
>
> Obviously, our main concern is the quality of the work and the time in which the work is completed. We are speaking with another firm (Turing) as well and they do not require

4

> long term agreements from what they have said so far. Their rate is comparable to what you have quoted. We just want to hear why you are better or different from Turing and what you are asking for in terms of a commitment."

15.     On January 6, 2021, Mr. Pridgen attempted to assuage Mr. Howe via email regarding the length of time that project would take and the 3-month minimum term for any agreement between the parties:  "Being that human capital management is my specialty at Chetu I can tell you that integrating with Paychex is a 8-12 week development project so that meets the three month man minimum."

16.     In response, Mr. Howe sent an email to Mr. Pridgen on January 6, 2021 expressing his concern about Chetu stretching out the project in order to increase its billing and receivables:

> So, you do have a 3-month minimum? I don't believe this portion of the project will take anywhere near that amount of time as API's are already enabled on our side, so it will be coordinating the two working together.
>
> I am sure the 3 months is more to do about commissions paid than anything else. Turing does not require a 3-month commitment, but it is very likely with the amount of work to be done that we will be working with a group for 6-12 months. But **what is important to us is that we hire the right developer to the position that is not going to be a "time waste" just trying to bill a bunch of needless hours and stretch the project**.
>
> There is plenty of work to do, but **I have been warned about companies that are the middlemen for developers and how they often are all about hitting those billable hours and not about providing solid work ethic**. That is why I am inclined to work with Turing, your rates are fine but if you believe in the

product/service you offer than you should not have to lock clients into termed agreements.

17.     Perhaps realizing that he was about to lose a sale, Mr. Pridgen made the following representations to Mr. Howe in an email dated January 6, 2021, of which the highlighted portions turned out to be patently false:

> For the sake of transparency I will explain why we have a three month minimum engagement. If you remember back to our call and our rates, **for $25/hour you are receiving a dedicated developer, team lead, QA team, shared UI/UX, technical project manager, and Director of Operations**. **That doesn't include other positions that are involved like floor managers, architecture team, etc**. **To be honest, we don't become profitable on an account until the third month since our margins are so low**. As a business owner you aren't in the business of losing money and neither are we as an organization.
>
> **We aren't a middleman as we are a US based company and all work is done by Chetu employees**. We take pride that we have no external investors and all leadership has grown from within (everyone starts and the developer level and works their way up).
>
> **We don't drag projects out and the goal is to save our clients' money**. **Of the over 500 active development projects that we currently have, 47% of those are customers who come back with other development work or referrals from our clients**. If our goal was to drag things out and milk money from our clients, this would not be the case.
>
> . . . If you are interested in speaking with my Director of Operations who will showcase our experience and show what is required to architect the solution we can do that as well. Just let me know how you would like to proceed.

6

18.     Based on Mr. Pridgen's representations, Mr. Howe agreed to take the next step by speaking with one of Chetu's Director of Operations, Jaideep.  In early February 2021, Jaideep and Mr. Howe participated on a telephone call.  During the call, Mr. Howe and Jaideep discussed the scope of the engagement, including that Chetu would set up integration API's with Blue Chip's current payroll provider, Chetu would integrate Blue Chip's credit card processing directly into its POS system, and the development of a loyalty mobile application.  In response to Mr. Howe's concerns that Chetu would delay the completion of development in order to draw out monthly fees, Jaideep repeated Mr. Pridgen's earlier representations that Chetu would dedicate an entire team of employees to the development of the software, that Chetu does not nor has it ever dragged out or delayed projects, and that Blue Chip could expect the project to be completed by October 2021.

19.     Based on the representations of Mr. Pridgen and Jaideep, Mr. Howe agreed for Blue Chip to retain Chetu to develop the required software solutions.  Accordingly, on February 4, 2021, Chetu sent Blue Chip its standard adhesion software development contract.

20.     In reviewing the Software Contract, Mr. Howe sent Mr. Pridgen an email on February 16, 2021 asking for some clarification.  Specifically, Mr. Howe asked for clarification regarding Blue Chip's ownership of the coding, software documentation, and intellectual property created by Chetu for Blue Chip during the term of the Software Contract.   In response, Mr. Pridgen confirmed that "[a]bsolutely, all code, documentation, and intellectual property belongs to you."  Mr. Pridgen further confirmed that there was no additional compensation needed for Blue Chip to own the code or to license any intellectual property.  Mr. Pridgen also represented that Chetu would return Blue Chip's deposit after 6-8 months of "good payment history."

21.     Based on the various representations of Mr. Pridgen and Jaideep, Mr. Howe executed the Software Contract, including a Work Order attached as Exhibit A thereto, on February 17, 2021.

22.     Pursuant to Section 7 of the Software Contract, "Chetu . . . grant[ed] to [Blue Chip] a worldwide, irrevocable, non-exclusive, fully-paid up, royalty-free, transferable and sub-licensable license to use, sell, and distribute the Chetu Existing Intellectual Property only insofar as it is incorporated in, or required for [Blue Chip] to use, sell, or distribute the Deliverable or any work product resulting from the Services."

23.     Section 10(a) of the Software Contract provides that "[e]ither party may termination this Agreement and/or Work Order issued hereunder for any reason or no reason whatsoever, at any time providing two (2) week advance written notice to the other party."

24.     Buried in Confidentiality clause of Paragraph 6 in Chetu's adhesion agreement is a provision which, unbeknownst to Blue Chip, Chetu uses to suppress valid public complaints regarding its fraudulent and deceptive business practices (the "Strategic Lawsuits Against Public Participation" or SLAPP Clause):

> "Neither shall threaten the other party or make, post, publish, or communicate to any person or entity or in any public forum any comments or statements (written or oral) that intentionally seek to degrade or disparage, or are detrimental to, the reputation or stature of the other party or its businesses, or any of its employees, directors, and officers and existing and prospective customers, suppliers, investors and other associated third parties."

As a result, Blue Chip was unaware of the fraudulent scheme engaged in by Chetu for which Blue Chip was about to become the latest victim.

25.     Chetu began work in March 2021 regarding fixes and additions to Blue Chip's POS system.  Initially, Chetu made a positive impression on Blue Chip.  Part of that impression was due to the progress reports that Chetu's developers on the project, initially a developer named Simmi and then a developer named Mangaldeep, emailed to Mr. Howe every few business days which purported to show continual progress in the development process.  Upon information and belief, these "progress reports" were knowingly false when sent, were sent with the intent to deceive Blue Chip into paying for services that were not actually being provided, and were sent with full knowledge that Blue Chip was relying on them in paying their monthly development fees and adding features to the project.

26.     For example, Blue Chip agreed to pay for two additional features to be built onto its POS system – a payroll feature and a tipping feature – based on the "progress" it believed was occurring on the project.  After several months, it became clear that the applications Chetu built were not compatible with Blue Chip's POS as they did not perform properly.  Chetu convinced Blue Chip that the reason was not due to Chetu's performance or actual lack of progress, but rather, the coding for Blue Chip's original POS was antiquated, that it would not be useful in the long term, and that Chetu should code a new POS system for Blue Chip.  Upon information and belief, these representations to Blue Chip were knowingly false when made or were made without a reasonable basis at the time.

27.     Accordingly, in June 2021, Blue Chip agreed to pay Chetu to code an entirely new POS system.  Blue Chip provided Chetu with access to its original POS system in order to make it easier for Chetu's team to understand the expectations for the features Blue Chip needed for its new POS system.  Because the payroll and tip features had allegedly already been developed as confirmed in the regular "progress"

reports, Chetu represented that the new POS system with those additional features would be completed by the first week of October 2021.

28.     Based on these assurances, and the regular progress reports, Blue Chip continued to pay Chetu its monthly development fees.

29.     Over the next several months, Chetu repeatedly assured Blue Chip that all of the development work would be completed by the first week of October 2021. These assurances were made in email, on calls, and through the regular progress reports.  Chetu then missed the promised delivery date without notice or warning. As a result, Mr. Howe reached out to Mr. Pridgen to find out why the delivery was not made and when the software would be delivered.  Mr. Pridgen directed Mr. Howe to Chetu's general manager, Gaurav Sharma, for those answers.

30.     On or about October 22, 2021, Mr. Howe spoke at length Mr. Sharma regarding Blue Chip's dissatisfaction with the delay and Blue Chip's demand that a firm completion and delivery date be set.  During the call, Mr. Sharma represented to Mr. Howe that there were "unexpected technological issues" that were the cause of the delay and that Chetu had assigned its "elite technical council team" to resolve those issues.  Mr. Sharma explained that they could not define a deadline based on the current approach as more "research" was needed.  In other words, Mr. Sharma admitted that despite months of development, Chetu had no idea why the new POS system was completely non-functional.

31.     Mr. Sharma then proposed an "alternative path to the solution," which he claimed required additional work to be performed at Blue Chip's expense.  Mr. Sharma represented that this "alternative" approach would take at least two and a half weeks and require a re-test plus an additional 1 week due to the "architectural change."  Mr. Sharma explained that the final release would include an "online mode for POS, [a]nalytical portal with resolution to crashing issue, known UI/Usability

issues fixes (text vs button click) and reconciliation issues that you had specified during the call." Mr. Sharma promised a "firm delivery date" of November 18, 2021. Mr. Sharma sent a confirming email to Mr. Howe, which included his various representations, on October 22, 2021.

32.   Mr. Howe was stunned by Mr. Sharma's disclosure. At no point prior to October 22, 2021 had any person at Chetu informed Blue Chip that there had been any technical issues or that Chetu would miss its promised delivery date. In fact, Blue Chip had previously requested and paid for additional resources in order to ensure that the development project was completed by the first week of October 2021. Mr. Howe had repeatedly informed Chetu that Blue Chip's POS existing systems was not functioning efficiently and that it was urgent to have the new POS system as quickly as possible.

33.   In response to Mr. Howe's complaints, Mr. Sharma asked Mr. Howe to participate on another telephone call to discuss Chetu's plan for meeting the November 18, 2021 "firm delivery date." That call occurred on or about October 27, 2021.

34.   During the call, Mr. Sharma promised to provide Blue Chip with a working copy of the solution that included the required architectural changes no later than November 18, 2021 and to keep Blue Chip apprised of the progress at regular intervals. Mr. Sharma claimed that the overall architecture was well designed, would provide an easy adoption to any platform, and that the only change required was to minimize the use of REDUX as local storage and, instead, to make additional API calls to save the information in the database. Mr. Sharma admitted that Chetu's original decision to keep REDUX as interim data storage was a mistake as was Chetu's failure to disclose this decision during the process. Mr. Sharma then promised to bring on additional resources to contribute to the promised changes "so

11

that we can meet the committed timeline of 11/18." Mr. Sharma memorialized these statements in an email to Mr. Howe on October 27, 2021.

35.     In response, Mr. Howe reminded Mr. Sharma in an email dated October 27, 2021 that Blue Chip had paid Chetu more than $90,000 as of their conversation and that Blue Chip had nothing to show for that money. Mr. Howe demanded that Blue Chip see that the new POS system was operational before making further payments, the next of which was due on November 15, 2021 (excluding the fact that Blue Chip had a month of services on deposit). While Mr. Howe explained that he understood that there may be some bugs that still need to be fixed, it was critical that "all buttons on the POS system and Analytics need to be operational and the system should be completed on Chetu's end and fully ready to test on the 18th or earlier. This also includes the receipt printer and cash drawers should be working by the 18th." Mr. Howe explained that once the POS and Analytics were delivered on November 18, 2021, the parties could then move to additional work that Blue Chip needed to have completed. Mr. Sharma confirmed in a follow-up call with Mr. Howe Chetu's understanding and agreement.

36.     Chetu subsequently requested that Blue Chip participate on a live video call with its team on November 8, 2021. Chetu promised that much of the POS was operational and would be ready to review.

37.     Eager to see a functioning POS system, Blue Chip had six members of its corporate team attend the live demonstration. The demonstration, however, was a complete disaster. After approximately 30 minutes of Chetu's "elite technical team" attempting to troubleshoot why the POS system was unable to perform the simplest of tasks, such as inputting a new customer and adding them to the waiting list, Chetu ended the meeting.

38.     Immediately after the failed demonstration, Mr. Howe sent an email to Mr. Sharma expressing his deep concern regarding the lack of progress, the inability of the new POS system to perform the most basic of tasks, and Chetu's ability to deliver a fully functional POS application by the "firm delivery date" scheduled for November 18, 2021.  Mr. Howe then asked Mr. Sharma for assurance that the additional elite team members overseeing the build would come together as agreed to deliver a fully functional final product.  Mr. Sharma assured Mr. Howe that "[w]e are on it."

39.     Chetu, however, did not deliver a functioning POS system on the "firm delivery date" of November 18, 2021 as promised.

40.     Over the next several months, Mr. Sharma and various members of the Chetu team repeatedly represented that Chetu was making progress on the new POS application and that it would be delivered "shortly."  These representations were made through email communications, through the regular progress reports, and through phone calls with various team members and Mr. Howe.  Mr. Sharma and the rest of the "elite" team members assigned to Blue Chip's POS application knew that these representations were false, that Chetu had no clue how to resolve the issues of the new POS system it was coding, and that it had no idea regarding whether or when a fully functional POS application would be delivered.  Chetu also knew that Blue Chip was desperate to have a functioning POS system and that it would take months for Blue Chip to restart with a new developer.  Thus, Chetu made these repeated assurances that the POS system was close to being finished in order to induce Blue Chip into continuing to pay the monthly development fees.

41.     Frustrated with the constant lack of progress, Mr. Howe sent Mr. Sharma an email on March 25, 2022 asking for an urgent meeting to discuss the POS application.  As Mr. Howe pointed out, it had been more than four months since the

"firm delivery date" and more than 14 months since the Software Contract was signed and, yet, Chetu had failed to deliver "a basic functioning POS system."

42.     On or about April 1, 2022, Mr. Howe and Mr. Sharma participated on a telephone call to discuss the status of the project.  During the call, Mr. Sharma identified a host of excuses for why Chetu had failed to deliver a functioning POS system months after it promised to do so.  For example, Mr. Sharma claimed that the project involved a very complex application and that it was common for issues to exist in the development of the software.  Mr. Sharma also claimed that his "elite" team was moving so fast in their efforts that they were making numerous mistakes along the way, which he also claimed was common in development.  In reality, Mr. Sharma had no idea why his developers were unable to create a functioning POS system and his statements were a desperate attempt to stall and delay Blue Chip's termination of the relationship.

43.     Mr. Sharma then proposed potential solutions to his team's incompetence.  First, Mr. Sharma offered to adopt a "Test Drive Development" approach.  Mr. Sharma explained that Chetu had not adopted this approach over the previous 14 months because Chetu was attempting to expedite the development of the software, especially after June 2021 when Blue Chip hired Chetu to develop a new POS system rather than using the existing code.  Second, Mr. Sharma offered "Quality Assurance (QA) Automation," which would utilize an "automated regression testing tool" to create script that could be executed before each release to identify issues with the code in advance.  Mr. Sharma acknowledged that the QA Automation would require a different skill set of resources, which Chetu did not have and would need to onboard onto the project despite Mr. Pridgen's and Mr. Sharma's original representations that the hourly rate charged included QA.

14

44.     Mr. Sharma represented that while some "clean up" would be needed at the code level "due to rapid development for which we have involved elite technical council to do a code review and help team identify the priory and direction for the cleanup . . . this should NOT impact the current production release plans." Mr. Sharma further represented that Chetu would "also involve a designer from [its] side to clean up the UI/UX . . . ."  Mr. Sharma memorialized the April 1, 2022 call in a follow-up email.

45.     Despite these representations, Chetu did not deliver a functioning POS system in April or May.  Nonetheless, based on Chetu's repeated assurances that it was on the verge of delivering the new POS system, and given Chetu's threats that it would cease its development efforts if payment was not timely made, Blue Chip continued to pay the monthly development fee.

46.     In early May 2022, Mr. Sharma informed Mr. Howe that the POS application was ready for demonstration.  Accordingly, on May 11, 2022, Mr. Howe sent a Zoom invite to Mr. Sharma and Chetu's development team for the following day in order to obtain an update regarding the status of the project.

47.     The following day, Mr. Sharma emailed Mr. Howe to inform him that the meeting needed to be cancelled because, once again, the new POS system was not ready for demonstration.  Mr. Sharma, however, represented that the Paycheck and Netspend integrations were done and were simply waiting for testing.  Mr. Sharma represented that the testing would be complete for the payroll integration on May 13, 2022 and for the tipping application on May 16, 2022.  These statements were knowingly false when made as the two integrations were not done at that time.

48.     On June 3, 2022, Chetu attempted to roll out part of the POS system with what it called "hot fixes."  The rollout failed miserably as the hot fixes

immediately caused issues with checking customers in and completely froze Blue Chip's system.  As a result, they had to roll back to the pre-existing POS system.

49.     On June 4, 2022, Mr. Howe sent Mr. Sharma an email describing the failed rollout of the hot fixes.  Exasperated by the lack of "stable solution" after more than a year and nearly $150,000 spent, Mr. Howe reminded Mr. Sharma of his promise to deliver a final product on November 18, 2021 and requested that the parties have a call to discuss the final plan.

50.     After the email, Mr. Howe and Mr. Sharma also discussed the possibility of Blue Chip providing the two-week notice and potentially litigating the matter.  Mr. Sharma asked Mr. Howe to provide him with two more weeks so that Chetu could deliver a stable POS as repeatedly promised.  Mr. Howe agreed to give Chetu the additional time requested by Mr. Sharma.

51.     Chetu did not deliver the stable POS application as promised within those two weeks.  Instead, Chetu provided a two-page list of deliverables and a timeline for each, with the earliest deliverables promised by June 30, 2022 and the final deliverables promised by July 28, 2022.

52.     Based on the delivery schedule provided by Chetu, Blue Chip paid development fees through May 2022.  In addition, despite a perfect payment history, Chetu had never returned Blue Chip's $9,000 deposit as previously promised, which covered an additional month of development fees.

53.     Chetu did not provide to Blue Chip the deliverables set forth in the two-page list.  As a result, on July 13, 2022, Blue Chip sent a letter, through its counsel, confirming the delivery schedule and requesting that Chetu state whether it intended to meet each of the deliverable schedules as promised.

54.     In response, that same date, without providing Blue Chip with two-weeks' written notice as required by the Software Contract, Chetu terminated the

agreement effective immediately without providing any of the deliverables promised.

55.     On July 26, 2022, Chetu's legal department sent an email claiming that an unpaid balance was due despite Blue Chip paying all development fees through May 2022 and despite Chetu never returning Blue Chip's deposit.  The email was a pretext to falsely claim that Blue Chip was prohibited from any irrevocable licensing rights granted under Section 7 of the Software Contract.  Specifically, Chetu stated:

> "[Y]ou are hereby notified to Cease and Desist any and all use of any Chetu Created IP, as per Section 7 of our contract. Any use, share, or modification of any such IP, in whole or in part or of its derivative(s), by the company or any of its agents, including you individually, shall be a violation of our IP rights and the legal contract. The definition of IP is in the contract, and is not merely limited to source code but also includes knowledge and know-how encapsulated in documents, emails and other communication. Our remedies shall be cumulative per the contract."

56.     Chetu never provided Blue Chip with a final accounting.

57.     Based on the foregoing, there is an actual controversy that is of sufficient immediacy and reality to justify the issuance of a declaratory judgment. Blue Chip seeks a declaration confirming that Blue Chip owns or otherwise has an irrevocable license as to the code and documents paid for by Blue Chip even though Chetu failed to deliver a stable or functioning POS application, including all copyrights related thereto, and that Blue Chip is not infringing upon Chetu's rights in POS applications it attempted to develop for Blue Chip, including the source code and related documentation.

58.     Chetu's actions have directly harmed Blue Chip's reputation and Blue Chip's ability to launch its POS applications.  Due to Chetu's failures to perform

under the Software Contract, Blue Chip has had to delay the launch of its POS application and loyalty program as well as incur additional costs to develop a new POS application from scratch through another developer as the code provided by Chetu was completely worthless.  Blue Chip has suffered substantial harm, in an amount to be proven at trial, but not less than the $155,675.00 Blue Chip paid Chetu for software that Chetu never delivered and for code that is entirely worthless.

## COUNT I

## DECLARATORY JUDGMENT OF NONINFRINGEMENT AND OWNERSHIP OF COPYRIGHT

59.     The allegations of paragraphs 1-58 are incorporated by reference as if fully set forth herein.

60.     A real, justiciable, and actual controversy exists between Blue Chip, on the one hand, and Chetu, on the other, as to whether Blue Chip is the copyright owner or irrevocable licensee of the POS application, and all intellectual property rights relating thereto.

61.     Pursuant to 28 U.S.C. § 2201, Blue Chip respectfully requests a declaration from this Court establishing (i) Blue Chip as the copyright owner or irrevocable licensee of the POS application, related code, and documentation, (ii) declaring that Blue Chip has not infringed, and is not now infringing, willfully or otherwise, any copyright held by Chetu in the POS application, related code, or documentation, and (iii) all copyright and all intellectual property rights relating to the POS application have been assigned or licensed to Blue Chip in perpetuity for which no further compensation is or will ever be owed.

## COUNT II

## BREACH OF CONTRACT

62.     The allegations of paragraphs 1-58 are incorporated by reference as if

fully set forth herein.

63.     Blue Chip and Chetu entered into the Software Contract whereby Chetu agreed to design, develop, and deliver a new POS application for use by Blue Chip in each its eleven (11) locations.  The Software Contract did not provide a schedule for delivery.  Instead, Chetu orally agreed to deliver the application during the first week of October 2021.  Chetu subsequently agreed, in writing, to a "firm delivery date" of November 18, 2021.

64.     Blue Chip paid all monies required and performed all obligations required of it under the Software Contract except to the extent that such performance was excused.

65.     Chetu breached the parties' agreement by failing to deliver a defect-free POS application on or before the "firm delivery date" of November 18, 2021.

66.     Chetu further breached the Software Contract by failing to deliver a functioning POS system by June 2022.

67.     Chetu further breached the Software Contract by terminating without providing the requisite two-week notice.

68.     Blue Chip was harmed in an amount of not less than $155,675.00, which is the money it paid for the POS application that was never delivered by Chetu.

**COUNT III**

**FRAUD IN THE INDUCEMENT**

69.     The allegations of paragraphs 1-58 are incorporated by reference as if fully set forth herein.

70.     Prior to entering into the contract and during the performance of the development of the POS application, both Mr. Pridgen and Mr. Sharma, on behalf of Chetu, fraudulently represented to Mr. Howe over the phone and over email in November 2020 that:

a.    Chetu would dedicate a developer, team lead, Quality Assurance team, shared UI/UX, a technical project manager, a Director of Operations, floor managers, architectural team, and other persons who would all work on Blue Chip's project for a cost of $25 per hour;

b.    all work would be performed by Chetu employees;

c.    Chetu had 500 active development projects in November 2020; and

d.    47% of those 500 active projects, or 235, were returning customers or client referrals.

71.    Chetu's fraudulent representations as detailed above were a material inducement for Blue Chip to enter into the Software Contract with Chetu and to pay the monthly development fees demanded by Chetu.  Had Blue Chip known the true facts, namely that Chetu had no intention of dedicating each of the team members it claimed, that Chetu used foreign contractors rather than U.S.-based employees to perform development work, and that Chetu did not have the number of clients, returning customers, or client referrals claimed, Blue Chip never would have entered into the Software Contract at issue let alone the monthly development fees it paid to Chetu for nearly 16 months.

72.    In addition, Mr. Sharma continued to make knowingly false representations in order to induce Mr. Howe and Blue Chip to continue paying the monthly development fees after Chetu failed to deliver the software applications by the "firm delivery date" of November 18, 2021.  Specifically, Mr. Sharma made the following representations, both orally via telephone and in email, that:

a.  an "elite technical council team" had been assigned specifically to Blue Chip's project in order to rapidly resolve ongoing technical issues with the POS application and that the team had made progress on resolving such issues;

b.  the Paycheck and Netspend integrations were done and were simply waiting for testing and fixing missed scenarios;

c.  Chetu was close to delivering a stable POS application.

73.  In addition, Simmi and Mangaldeep continued to make knowingly false representations to Mr. Howe in order to induce Blue Chip to continue paying the monthly development fees by sending regular "progress" reports, which falsely represented the progress of the software allegedly being developed for Blue Chip.

74.  Because Mr. Pridgen, Mr. Sharma, Simmi, Mangaldeep, and Chetu held themselves out as experts in the work to be performed, Blue Chip's reliance on Mr. Pridgen's, Mr. Sharma's, and Chetu's false representations was reasonable.

75.  Each of the representations made by Mr. Pridgen, Mr. Sharma, Simmi, Mangaldeep, and Chetu were knowingly false at the time they were made and/or neither Mr. Pridgen, Mr. Sharma, Simmi, Mangaldeep, nor Chetu had a reasonable basis for making them at the time.

76.  As a direct and proximate result of Mr. Pridgen's, Mr. Sharma's, Simmi's, Mangaldeep's, and Chetu's fraud, Blue Chip paid Chetu no less than $155,675.00.

77.  In addition, Blue Chip has been further damaged in the amount to be proven at trial regarding the defective work performed and the additional expenses Blue Chip incurred in order to develop the software promised by Chetu.

**COUNT IV**
**VIOLATIONS OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**

78.     The allegations of paragraphs 1-77 are incorporated by reference as if fully set forth herein.

79.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA" or the "Act") provides that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Section 501.204, Florida Statutes (2012).

80.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their software development services, Chetu represented, directly or indirectly, expressly or by implication, that it has the skill, experience, expertise, and employees who could perform the development services sought by a customer.  Chetu further represented, directly or indirectly, expressly or by implication, that it dedicates an entire team of qualified persons to each project for a aggregate price of $25/hour.  Chetu further represented, directly or indirectly, expressly or by implication, that it was making regular progress on its development of the software applications as reflected in detail in each of the regular "progress" reports.

81.     In truth and in fact, in numerous instances in which Chetu and its employees have made the representations set forth above, Chetu do not have the employees it claimed and, despite its representations to the contrary, Chetu hired foreign contractors to provide the very services it claims were performed by its U.S.-based employees.  In addition, there was no dedicated team assigned to Blue Chip's project nor was Chetu making the progress it repeatedly claimed.

82.     Indeed, Chetu's entire business model is to induce customers into a monthly development fee and then to drag out the development process indefinitely in order to churn fees without delivering the product promised on the timeline promised.  Moreover, Chetu aggressively enforces the SLAPP Clause in order to not

only suppress its defrauded customers from exercising their free speech rights, but also to prevent unsuspecting potential customers, including Blue Chip, from discovering Chetu's fraudulent and deceptive business practices as part of their due diligence efforts.

83.    Blue Chip is informed and believes, and thereon alleges, that it is but one of more than 150 victims of Chetu's fraudulent and deceptive business practices.

84.    Chetu's representations as set forth above were false and misleading and constitute deceptive acts or practices in violation of Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act.

85.    Blue Chip was actually harmed by Chetu's deceptive and unfair business practices in that it paid Chetu $155,675.00 for software that was entirely valueless.

86.    Blue Chip is entitled to recover its actual damages, civil penalties, and its reasonable attorney's fees pursuant to the Act.

## **PRAYER**

WHEREFORE, Blue Chip prays for judgment against Chetu as follows:

1.    For compensatory damages in the amount of no less than $155,675.00;

2.    For pre- and post-judgment interest;

3.    For civil penalties for each of Chetu's violations under the FDUTPA;

4.    For reasonable attorneys' fees pursuant to the provisions of Section 501.2105, Florida Statutes, and as otherwise allowable by applicable statutes or law; and

5.    For costs of suit incurred; and

6.    For such other and further relief as the Court may deem just and proper.


Dated:  August 24, 2022                    Respectfully submitted,

McKOWN BAILEY
2525 Ponce de Leon, 12th Floor
Coral Gables, FL 33134
Telephone:  (949) 858-3200
E-Mail: aaron@mckownbailey.com
        sylvia@mckownbailey.com

By:  /s/ Aaron M. McKown            .
    Aaron M. McKown
    Florida Bar No. 1002008
*Attorneys For Plaintiff*
BLUE CHIP ALLIANCE, LLC