UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-CV-61602-LEIBOWITZ/REID

BLUE CHIP ALLIANCE, LLC,

      Plaintiff,

vs.

CHETU, INC.,

      Defendant.

_____

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

    This matter is before the Court upon:

1. Defendant Chetu, Inc.'s ("Defendant" or "Chetu") Motion for Summary Judgment ("Chetu's Motion") and Statement of Facts in Support [ECF Nos. 101 and 102]; Plaintiff Blue Chip Alliance, LLC's ("Plaintiff" or "Blue Chip") Opposition and Statement of Facts in Opposition [ECF Nos. 109 and 110]; and

2. Blue Chip's Motion for Summary Judgment ("Blue Chip's Motion") and Statement of Facts in Support [ECF Nos. 103 and 104]; Chetu's Opposition and Statement of Facts in Opposition [ECF Nos. 107 and 108]; and Blue Chip's Reply in Support of its Motion for Summary Judgment and Reply Statement of Facts. [ECF Nos. 115 and 114].

    These matters were referred pursuant to 28 U.S.C. § 636 by the Honorable David S. Leibowitz for a Report and Recommendation. [ECF No. 148]. For the reasons stated below, the undersigned respectfully **RECOMMENDS** that Chetu's Motion [ECF No. 101] and Blue Chip's Motion [ECF No. 103] be **GRANTED IN PART** and **DENIED IN PART**.

**BACKGROUND**

This lawsuit arises out of a failed business relationship between Chetu, a software developer, and Blue Chip, an owner and operator of eleven barber shops in Washington and Montana. [ECF No. 86 at 3]. As addressed fully in the section that follows, the agreement called for Chetu to provide software development services. In exchange for approximately $150,000 in payment, Blue Chip alleges it received nothing from Chetu.

Blue Chip's Second Amended Complaint seeks a declaratory judgment of noninfringement and ownership of copyright (Count I) and alleges breach of contract (Count II), fraud in the inducement (Count III), and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count IV). [ECF No. 86]. Chetu's single counterclaim for breach of contract is alleged in response to Blue Chip's First Amended Complaint. [ECF No. 27].

## I.      **Procedural Background**

The undersigned will provide a brief procedural summary of the case before analyzing the merits of the instant Motions.

On February 17, 2023, the district judge previously assigned to this case, Judge Rodney Smith, partially granted Chetu's Motion to Dismiss the Complaint. [ECF No. 25]. On declaratory judgment (Count I), Judge Smith granted dismissal with leave to refile because Blue Chip failed to plead that the software contract is ambiguous. [*Id.* at 10]. On breach of contract (Count II), the Court held that Blue Chip had adequately stated a claim based on Chetu's failure to give a two-week notice prior to terminating the contract. [*Id.* at 11]. On fraud in the inducement (Count III), the Court bifurcated the claim, which alleged both pre-contract representations and post-contract representations. [*Id.* at 12]. The Court dismissed Chetu's pre-contract representations based on a review of the contract's integration clause, but denied dismissal based on Chetu's post-contract representations. [*Id.* at 12–13]. On FDUTPA (Count IV), the Court dismissed—without leave to

replead—two theories brought under this claim: (1) it dedicated an entire team of professionals to each project and (2) Chetu's enforcement of the SLAPP clause of the contract. [*Id.* at 14–15].[1]

On March 15, 2024, Judge Smith denied Chetu's Motion for Judgment on the Pleadings as to Counts I and IV. [ECF No. 129]. On declaratory judgment (Count I), the Court found that no ambiguity exists in the contract's intellectual property clause (Section 7), and instead held that the issue is a question of fact, not of contract interpretation. [*Id.* at 11]. On Blue Chip's FDUTPA claim (Count IV), the Court held that Chetu had not established that it is entitled to judgment on the pleadings on Blue Chip's two alleged theories that were dismissed in the order of dismissal. [*Id.*]. The instant Motions for Summary Judgment [ECF Nos. 101, 103] followed.

## II.    **The Statements of Material Facts and the Applicable Rules**

As an initial matter, there are several deficiencies with the parties' Statements of Material Facts and responses. First, the undersigned previously addressed the deficiencies in Plaintiff's Statement of Material Facts in support of its Motion but determined that it can disregard Plaintiff's improper inclusions in making a recommendation on summary judgment. [*See* ECF No. 164]. Second, a review of Defendant's Opposition to Plaintiff's Statement of Facts [ECF No. 108] reveals that Defendant fails to offer controverting evidence when disputing some of the facts asserted by Plaintiff. For example, Defendant disputes virtually every deadline provided to Blue Chip (to complete either all or part of the project per the contract) because the deadlines were never incorporate into the Contract. [*See e.g.*, ECF No. 108 ¶¶ 8, 19, 21, 26]. This is despite testimonial and documentary evidence supporting, at a minimum, deadlines for partial completion of the project. [*Id.*]. In another example, Defendant states "disputed" with respect to paragraph 9, which

---

[1] In sum, the Order granted Plaintiff leave to file an Amended Complaint to "[amend] only its declaratory judgment claim.. . ." [ECF No. 25 at 15].

discusses positive progress updates provided by Chetu regarding the status of the project, from the inception of the project through early June of 2021. [ECF Nos. 104 ¶ 9; 108 ¶ 9; 104-1 at 2]. But Defendant wholly fails to dispute this fact with evidentiary support, choosing instead to explain the issues that led to Phase II of the project in early June of 2021. [*Id.*]. Accordingly, the Court deems facts admitted where Plaintiff provides sufficient evidentiary support for its assertion, and Defendant fails to provide controverting evidence to support disputing the assertion. Fed. R. Civ. P. 56(e). S.D. Fla. L.R. 56.1(c)–(d).

Additionally, as to Defendant's Statement of Material Facts in support of its Motion [ECF No. 102], Defendant failed to reply to the additional facts alleged by Plaintiff. [ECF Nos. 110, 114]. Local Rule 56(b)(3)(A) directs a movant to respond to an opponent's additional facts. Because Defendant provided no response to Plaintiff's additional facts, the Court deems admitted those facts[2] for which Plaintiff provided sufficient evidentiary support.

### III.    The Undisputed Facts[3]

The undersigned finds that the following facts are undisputed. Blue Chip is the owner and operator of eleven modern-day barber shops in Washington and Montana. [ECF Nos. 104 ¶ 1; 108 ¶ 1]. The company integrates technological conveniences to enhance the customer experience. [*Id.*]. Blue Chip launched a search to identify a software development team who could create and/or improve its customer loyalty and scheduling experience, as well as automate payroll and other administrative tasks. [ECF Nos. 104 ¶ 2; 108 ¶ 2]. Blue Chip and Chetu executed a Contract

---

[2] Most of Blue Chip's additional facts include legal conclusions and unnecessary adjectives. [*See* ECF Nos. 110 ¶¶ 16–17; 114 ¶¶ 15–17]. As discussed in the Court's Order on Chetu's Motion to Strike, the undersigned will disregard legal conclusions and unnecessary adjectives alleged to be undisputed material facts. [ECF No. 164].

[3] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions. For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

and Work Order late February of 2021, with work commencing in March of 2021. [ECF Nos. 104 ¶ 3; 108 ¶ 3]. In March of 2021, the parties entered into a second Work Order. [ECF Nos. 108 ¶ 2 of Opposing Statement of Facts; 27-1 at 4].[4] Specifications regarding the project were provided by Blue Chip and Blue Chip approved the design documents and project plans. [ECF Nos. 108 ¶¶ 3, 4 of Opposing Statement of Facts; 114 ¶¶ 3, 4].

At that time, Blue Chip had successfully been running its existing Point of Sale ("POS") system at all of its locations. [*Id.*]. Blue Chip originally hired Chetu for the sole purpose of fully integrating Blue Chip's existing POS system into the Netspend and Paychex Application Programmatic Interfaces ("APIs"), which became known as Phase I of the project. [ECF Nos. 104 ¶ 6; 108 ¶ 6]. In relevant part, the Contract and Work Orders included provisions regarding termination, scope of work, non-disparagement, and intellectual property rights, among other clauses. [Contract at ECF No. 86-1].

After the Contract was executed, but before work had commenced, Chetu's Technical Project Manager, Atma Ram Tripathi, along with his development team, attended a meeting with the Blue Chip team assuring it that Chetu had the requisite skill and experience to integrate the Blue Chip POS with the Netspend and Paychex APIs. [ECF Nos. 104 ¶ 7; 108 ¶ 7]. Mr. Tripathi expected integration of, at a minimum, the Netspend API, by mid-May of 2021. [ECF Nos. 104 ¶ 8; 108 ¶ 8; ECF Nos. 107-3 at 155–156, 166–167].

From March of 2021 to early June of 2021, no one at Chetu suggested that there were problems with the integration or issues with meeting the estimated deadlines. [ECF Nos. 104 ¶ 9; 108 ¶ 9; 104-1 at 2]. Chetu instead provided positive updates regarding the development of the

---

[4] The two Work Orders are substantively identical, save for the estimated start dates. [*See* ECF No. 27-1].

project. [*Id.*]. On May 27, 2021, an e-mail exchange between Chetu team members stated that the team was "new in JFX and [were] taking longer than expected." [ECF No. 104 at ¶ 16]. Then, during a weekly Zoom meeting between the Blue Chip and Chetu teams in late May or early June of 2021, Chetu informed Blue Chip that the language the POS system was written on, Java FX, was no longer supported by Oracle, and that this foundation would pose issues with integration of the system. [ECF Nos. 104 ¶ 10; 108 ¶ 10]. This became known as Phase II of the project. Blue Chip's expert, Paul Reimer, stated in his declaration that there was no reason that the Blue Chip POS could not be integrated with the requested NetSpend and Paychex APIs. [ECF Nos. 104 ¶ 13; 104-2 at ¶¶ 10–12]. Jared Strand, the developer who built the prior POS for Blue Chip, advised against rebuilding the POS as he believed the application he built was sufficient. [ECF Nos. 108 ¶ 12; 107-4 at 134]. He also estimated that the project should have taken at most six to eight months to complete. [ECF Nos. 114 ¶ 18; 101-4 at 236:8–24].

Then, in a June 3, 2021, e-mail to one of Blue Chip's owners, Mike Howe, Mr. Tripathi stated that the redevelopment of the POS application would take approximately 95 days to complete. [ECF Nos. 104 at ¶ 19; 104-1 at 10]. The deadline was not met. [ECF No. 104 at ¶ 20]. On October 22, 2021, Mr. Sharma e-mailed Mr. Howe that the "firm delivery date will be **11/18**." [ECF Nos. 104 at ¶ 21; 104-1 at 15 (emphasis in original)]. On November 19, 2021, Chetu agreed to provide Blue Chip with an incremental release, the first being December 3, 2021, and that "[t]he project will underline all the issues that will be fixed by that time." [ECF Nos. 104 at ¶ 22; 104-1 at 19]. This estimated deadline was not met. [ECF Nos. 104 at ¶ 23; 108 at ¶ 23]. On May 12, 2022, Mr. Sharma recommended to Mr. Howe that Chetu seeks to "finalize the features for proper demonstration." [ECF No. 104-1 at 21]. He stated that "the following two integration has been done, currently we are working on unit testing and fixing the missed scenarios[,]" and listing

directly below "Paycheck Integration – We will conclude the development by tomorrow (5/13)" and "Netspend Integration – We will conclude the development on Monday (5/16)." [*Id.*; ECF Nos. 104 at ¶ 24; 108 ¶ 24]. Again, these deadlines were not met. [ECF Nos. 104 ¶ 25; 108 ¶ 25]. On July 1, 2022, Mr. Tripathi provided an update on the status of the project to Mr. Howe, stating in relevant part that "[f]or NetSpend (MVP) and Paychex integration, we are targeting to complete the development by 7/28/2022." [ECF Nos. 104 ¶ 26; 108 ¶ 26; 104-1 at 30].

On July 13, 2022, Aaron M. KcKown, an attorney hired by Blue Chip, sent a letter to Chetu confirming the dates outlined in the July 1, 2022 e-mail (the "McKown Letter"). [ECF Nos. 104 ¶ 26; 108 ¶ 26; 104-1 at 31–32]. That same day, Mr. Tripathi informed the Blue Chip team that, "[p]er your request, the team will be terminated today." [ECF Nos. 104 ¶28; 108 ¶ 28; 104-1 at 33]. Chetu's CEO, Atal Bansal, thereafter gave an order to Chetu's employees to stop all work on the Blue Chip project. [ECF Nos. 104 ¶ 29; 108 ¶ 29].

For each month services were rendered, from March 2021 to July 2022, Chetu sent Blue Chip monthly invoices. [ECF Nos. 108 ¶ 11; 114 ¶ 11]. In the end, Blue Chip paid Chetu approximately $150,000 to complete the project. [ECF Nos. 104 ¶ 20; 108 ¶20].

## LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure (hereafter "Rule 56(a)") "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Fonseca v. Wal-Mart*

*Stores, E., LP*, No. 18-CV-62768, 2019 WL 7371813, at *2 (S.D. Fla. 2019) (quoting *Anderson*, 477 U.S. at 248).

The movant must support its assertion that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court[, among other things,] may: . . . consider the fact undisputed for purposes of the motion." *Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Policy Tr.*, 18-CV-25099, 2021 WL 7368630, at *2 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, 18-25099-CIV, 2022 WL 354241 (S.D. Fla. Feb. 7, 2022), *aff'd*, 22-10748, 2022 WL 17420869 (11th Cir. Dec. 6, 2022) (citing Fed. R. Civ. P. 56(e)).

When determining whether a genuine issue of material fact exists, courts "view all evidence and draw all reasonable inferences in favor of the nonmoving party." *Smith v. Royal Caribbean Cruises, Ltd.*, 620 F. App'x 727, 729 (11th Cir. 2015). Courts "resolve factual controversies in favor of the nonmoving party [ ] only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (emphasis in original).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion." *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d 1320, 1327 (S.D. Fla. 2016) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)). "Cross-motions for summary judgment will not, in themselves,

warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Torres*, 244 F. Supp. 3d at 1327 (internal quotation marks and citation omitted). "[A] court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Id.* at 1327–28.

<u>**ANALYSIS**</u>

Chetu moves for summary judgment on all of Blue Chip's claims as well as its single counterclaim for breach of contract. [ECF No. 101]. Blue Chip moves for summary judgment on breach of contract (Count II); fraud in the inducement (Count III); and violations of FDUTPA (Count IV). [ECF No. 103]. The undersigned will address each claim in numerical order.

**A.  <u>Declaratory Judgment</u>**

The Federal Declaratory Judgment Act states that, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "For a controversy to exist, 'the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

**a.  <u>*Chetu's Motion for Summary Judgment on Blue Chip's Request for Declaratory Judgment (Count I)*</u>**

Chetu's Motion seeks summary judgment on Count I of the Second Amended Complaint, which request a declaration from the Court establishing:

(i) Blue Chip as the copyright owner or irrevocable licensee of the POS application, related code, and documentation, (ii) declaring that Blue Chip has not infringed, and is not now infringing, willfully or otherwise, any copyright held by Chetu in the POS application, related code, or documentation, and (iii) all copyright and all intellectual property rights relating to the POS application have been assigned or licensed to Blue Chip in perpetuity for which no further compensation is or will ever be owed.

[ECF No. 86 at 19].

Section 7 of the contract discusses the parties' intellectual property rights. It states, in part:

a) <u>Chetu Existing Intellectual Property</u>. "Chetu Existing Intellectual Property" means any Intellectual Property created, developed, and reduced to practice by Chetu prior to the commencement of Services under this Agreement that are used by Chetu in creating, or are incorporated within, any Deliverable, the Services or other work performed under this Agreement. Chetu shall retain all right, title and ownership to any Chetu Existing Intellectual Property that is incorporated into any Deliverable of the Services.

b) <u>Chetu Created Intellectual Property</u>. "Chetu Created Intellectual Property" means any Intellectual Property created, developed, or reduced to practice by or for Chetu in performing the Services under this Agreement. Chetu Created Intellectual Property shall be considered **"work made for hire"** under applicable copyright law and the copyright will, subject to Customer's **compliance with the terms of this Agreement and upon receipt of payment in full**, be owned solely and exclusively by Customer.

c) <u>Licenses</u>.
   I)   Subject to **Section 10**, Chetu hereby grants to Customer a worldwide, irrevocable, non-exclusive, fully-paid up, royalty free, transferable, and sub-licensable license to use, sell, and distribute the Chetu Existing Intellectual Property only insofar as is incorporated in, or required for Customer to use, sell, or distribute, the Deliverable or any work product resulting from the Services.
   II)  Except as otherwise specifically provided in this Agreement, each party acknowledges and agrees that no licenses or rights to any of the Intellectual Property of the one party are given or intended to be given to the other party.

[ECF No. 86-1 ¶ 7(a)–(c) (emphasis added)].

Chetu argues in its Motion that Section 7 of the contract expressly conditions Blue Chip's ownership rights on "payment in full" for Chetu's services. [ECF No. 101 at 2]. This reference to

"payment in full[,]" it believes, encompasses all outstanding invoices. [*Id.* at 3]. It also argues that licensing rights are predicated on compliance with Section 10, which governs termination of services under the contract. [*Id.*].

Blue Chip raises apparent questions of fact challenging Chetu on three fronts: First, the "work made for hire" doctrine, which is referenced in Section 7, provides ownership of the software to Blue Chip immediately upon creation, pursuant to 17 U.S.C. § 201. [ECF No. 109 at 3–4]. This doctrine, it argues, creates ambiguity in the contract when taken together with the requirement that payment be made in full before the intellectual property is transferred. [*Id.*]. Second, it argues that there is ambiguity as to whether "payment in full" encompasses payment for work related to producing the software at issue versus payment of other ancillary fees. [*Id.* at 5]. It believes that this reference to "payment in full" is narrow—providing for payment for work done on the software code itself, particularly when compared with Section 10's requirement of payment for "all unpaid charges." [*Id.*]. Third, Blue Chip argues there is an inherent ambiguity as to whether the $9,000 deposit it paid at the commencement of the project (pursuant to the terms of the Work Orders) should have been applied to any final bill. [*Id*]

The district judge's dispositive orders provide insight into the parties' arguments. Chetu's Motion to Dismiss was granted on Blue Chip's request for entry of declaratory judgment because "Plaintiff [did not plead] that the meaning of "payment in full" is ambiguous[,]" granting Blue Chip leave to replead. [ECF No. 25 at 10]. Blue Chip's First Amended Complaint expands on this alleged ambiguity, and the allegations remained unchanged in the operative Second Amended Complaint. [ECF Nos. 26 ¶¶ 60–62; 86 ¶¶ 60–62].

The district judge's order on Chetu's Motion for Judgment on the Pleadings addressed the three arguments Blue Chip makes in opposition to Chetu's Motion. [ECF No. 129]. First, the Court

explained that there is no ambiguity in the contract's reference to work made for hire "because [17 U.S.C. § 201(b)] expressly permits the parties to change the terms of this statutory section[,]" which the parties did by conditioning transfer of the copyright on payment in full. [*Id.* at 10]. Second, the Court disagreed with Blue Chip's argument that the term "payment in full" used in section 7(b) of the contract, when compared to Section 10's reference to "all unpaid charges[,]" is ambiguous, citing a failure to offer authority in support of the argument. [*Id.* at 11]. Third, on Blue Chip's assertion that there is ambiguity as to whether Plaintiff's deposit paid to Chetu should have been applied to any final bill, the Court likewise disagreed finding the contract unambiguous. [*Id.*]. Importantly, the Court stated that "the issue raised by Plaintiff is <u>not</u> a matter of contract interpretation but a <u>question of fact</u>—whether Chetu applied Plaintiff's deposit to the outstanding balance and thus Plaintiff has paid Chetu in full." [*Id.* (emphasis added)]. Therefore, a question of fact exists as to whether Plaintiff has fully paid Chetu. Resolution of that fact will determine who owns the copyrights at issue. [*Id.*].

Chetu's Motion does little to advance its argument, and its failure to file a reply in support leaves several theories advanced by Blue Chip unaddressed. The only issue before the Court on Chetu's Motion is whether "payment in full" was provided by Blue Chip. [ECF No. 101 at 3].

Chetu asserts that Blue Chip failed to pay a June 2022 Invoice (#52026) in the amount of $4,825. [ECF No. 102 ¶ 14]. It cites to a transaction report and corresponding invoices. [ECF No. 101-7 at 3]. According to the customer balance details, the May 31 and June 30 invoices were left unpaid, leaving Blue Chip with a balance of $14,450. [*Id.* at 1]. Then, a $4,800 credit from "Customer Deposit" was applied, leaving a balance of $9,650. [*Id.*]. A second $4,800 credit was applied, leaving the balance at $4,850, plus an added finance charge. [*Id.*]. However, the last invoice, dated July 31, has a balance due of zero dollars. [*Id.* at 4].

Blue Chip disputes this, citing to the declarations of Mr. Bansal and Mr. Howe. [ECF No. 110 ¶ 14]. Most of the cited pages of Mr. Bansal's deposition include nothing more than a disagreement over whether the June invoice was paid. [ECF No. 104-7 at 334:24–336:23]. Mr. Bansal, however, confirmed that the $9,000 deposit was applied. [*Id.* at 338:13–22]. Mr. Bansal ultimately stated that approximately $5,800 is owed on the invoices. [*Id.* at 338:23–340:8]. According to Mr. Howe, as of July 13, 2022 (the date the McKown Letter was sent and Chetu ceased all work on the project), Blue Chip did not owe any money to Chetu. [ECF No. 104-1 ¶29]. It cites to an e-mail sent on the same date, an hour before Chetu sent its termination e-mail notice, on behalf of a Chetu employee identified by Mr. Bansal as a member of the Contracts Compliance and Accounting division. [*Id.*]. The e-mail states that Chetu received the scheduled payment, and that it may take up to two business days for the payment to clear. [*Id.*]. The e-mail also notes that the July 15, 2022 invoice is attached, asking for payment. [*Id.*].

The undersigned finds an issue of material fact persists, precluding summary judgment. Chetu alleges that it is owed $4,850, yet its latest invoice identifies a balance due of zero dollars. [ECF No. 101-7 at 4]. In its Motion and its statement of facts, it fails to address this point and others, such as, for example, the source of the $9,600 credited on July 6 and July 15 to the total amount owed. The Court cannot, therefore, reach the issue of whether "payment in full" was received, according to Section 7 of the contract, which would vest intellectual property rights in Blue Chip. Accordingly, Chetu's Motion is denied on Count I of Blue Chip's Second Amended Complaint.

## B.  **Breach of Contract**

"Summary judgment is appropriate in a contract dispute where the contract is clear and unambiguous on its face." *Panama Music, Corp. v. Universal Music Grp. Inc.*, No. 12-20200-CIV,

2013 WL 12310734, at *6 (S.D. Fla. July 9, 2013). "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id.* (internal quotation marks and citation omitted). Under Florida law, . . . "the elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Alhassid v. Bank of Am.*, N.A., No. 14-CIV-20484, 2015 WL 11216721, at *4 (S.D. Fla. Sept. 14, 2015) (internal quotation marks omitted) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003)); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).

Further, "[t]o constitute a vital or material breach, a defendant's non-performance must be such as to go to the essence of the contract." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. 4th DCA 2003)). "[T]he party alleged to have breached the contract must have failed to perform a duty that . . . is of such significance that it relieves the injured party from further performance of its contractual duties." *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015) (cleaned up). "A party's failure to perform some minor part of [its] contractual duty cannot be classified as a material or vital breach." *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008).

### a.  *Blue Chip's Motion for Summary Judgment on its Breach of Contract Claim (Count II)*

Blue Chip's Second Amended Complaint alleges a single claim for breach of contract but more than one breach. In its Motion, Blue Chip moves for summary judgment on the theory that Chetu failed to provide two-weeks' notice before termination, pursuant to Section 10 of the contract. [ECF No. 103 at 3]. Blue Chip argues that it has demonstrated the absence of any genuine issue of material fact on each required element of its claim. Specifically, Blue Chip argues that it is undisputed that the parties entered into a written contract; the contract required a two-week

notice period before termination could be effective; Chetu stopped all work as of July 13, 2022, without providing the requisite two-week notice, constituting a material breach; and damages resulted, amounting to $156,000. [*Id.* at 3–7].

Chetu alleges that a genuine dispute of material fact remains on this theory of liability. It relies on a the McKown Letter, dated, July 13, 2023, that purportedly expressed "a clear and unequivocal expression of intent to refuse payment of issued invoices before the time payment was due, thereby justifying Chetu's immediate termination as an anticipatory repudiation of the contract." Alternatively, it argues that, even if the immediate termination of work *is* a breach of the termination clause, it is immaterial. [ECF No. 107 at 2–3].

Here, the parties do not dispute the existence of the contract and two Work Orders. The disagreement stems from whether the McKown Letter constitutes a termination of the contract and, if it does not, whether Chetu's failure to provide a two-week notice prior to terminating the contract constitutes a material breach. Section 10 of the contract states:

> 10) Termination of Conclusion of Services
>
> a) Either part may terminate this Agreement and/or Work Order issued hereunder for any reason or no reason whatsoever, at any time by providing a two (2) week advance written notice to the other party.

[ECF No. 86-1 at 3].

Chetu admits that it stopped all work on the project July 13, 2022, the date it received the McKown Letter. [ECF Nos. 104 ¶¶ 28–29; 108 ¶¶ 28–29; 104-1 at 33]. The undersigned therefore agrees that Chetu failed to provide the requisite notice of termination pursuant to Section 10 of the contract, constituting a breach.

Chetu argues that the McKown Letter was a clear and unequivocal expression of intent to refuse payment. [ECF No. 107 at 2]. It believes that the letter demanded that the company complete

the entire application and deliver it to Blue Chip by the stated deadlines, despite the contract and Work Orders stating that Chetu would only provide "services" and not an "end product." [ECF No. 107 at 2–3]. Chetu also relies on the integration clause in the contract, which excludes any representations not expressed in the agreement and requires any amendment to be made in writing, signed by both parties. [*Id.* at 3].

To satisfy its burden, Chetu "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Chetu must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford–El v. Britton*, 523 U.S. 574, 600 (1998). Here, Chetu's only citation to the record on this issue is Mr. Bansal's deposition transcript where he explained that a receipt of a legal demand letter is a precursor to litigation. [ECF No. 107 at 3 citing 107-1 at 343:8–345:20]. This is insufficient. The existence of some factual disputes between the parties will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." Anderson, *477* U.S. at 248. Chetu's alleged dispute regarding the interpretation of the McKown Letter is not *genuine*. Indeed, a reading of the letter demonstrates that it was *not* a clear and unequivocal expression of intent to refuse payment. It merely memorializes the agreed deadlines for various deliverables as well as payments made by Blue Chip in reliance of those stated deadlines. [ECF No. 104-1 at 31–32]. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Turning to Chetu's failure to provide adequate notice of termination, Chetu believes the notice clause is immaterial. [ECF No. 107 at 2]. Blue Chip argues that the clause is material, relying on Chetu's July 1, 2022, e-mail which states that "[f]or NetSpend (MVP) and Paychex integration, we are targeting to complete the development by **7/28/2022**." [ECF Nos. 104 ¶ 26; 108 ¶ 26; 104-1 at 30 (emphasis added)]. Blue Chip asserts that, had Chetu honored the termination clause and provided a two-week notice as of the date the McKown Letter was received, the contract would have allowed it to cease all work two weeks later—by **July 29, 2022**. [ECF No. 103 at 6]. Therefore, the July 28, 2022, deadline—whereby Chetu promised integration of NetSpend and Paychex—would have been met *prior* to the expiration of the two-week notice clause. [*Id.*].

"An essential, or material, term is '[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" *Sunshine Children's Learning Ctr., LLC v. Waste Connections of Florida, Inc.*, 21-CV-62123, 2023 WL 2809509, at *7 (S.D. Fla. Apr. 6, 2023) (citing *U.S. Doe v. Health First, Inc.*, No. 6:14-cv-501-Orl-37DCI, 2017 WL 1929700, at *4 (M.D. Fla. May 10, 2017) quoting *Material Term*, Black's Law Dictionary (9th ed. 2009)).

While it is unclear whether the "entire project" would be completed by the July 28, 2022, deadline, It is undisputed that "the timeframe provided [was an] estimate[] of when a working version of the application including the subject integrations would be provided assuming no unforeseen obstacles." [ECF No. 108 ¶ 26]. As such, Blue Chip would have received, at a minimum, a working version of the application on July 28, 2022.  It follows that, in the context of the contract at issue, the termination clause is material. Certainly, other clauses of the contract, such as payment and scope work to be completed, are intertwined with the notice provision which, if followed, would have resulted in the production of a working version of the application. *See*

*Lary v. Boston Sci. Corp.*, 1:11-CV-23820, 2014 WL 978823, at *8 (S.D. Fla. Mar. 13, 2014), *aff'd*, 633 Fed. App'x 781 (11th Cir. 2016) (quoting *In re 4Kids Entm't, Inc.,* 463 B.R. 610, 683–89 (Bankr. S.D.N.Y. 2011) "terminating a contract without complying with the notice and cure provisions therein is itself a material breach")); *Sunshine Children's Learning Ctr., LLC,* 2023 WL 2809509, at *7 (analyzing a notice provision in the context of the contract as a whole and finding that the provision is material).[5]

### b. *Chetu's Motion for Summary Judgment on Blue Chip's Breach of Contract Claim (Count II)*

Though not entirely clear from the briefing, Chetu appears to be seeking summary judgment on all three theories under Blue Chip's breach of contract claim. That is, Chetu's failure to (1) deliver a defect-free POS application on or before the firm delivery date of November 18, 2021; (2) deliver a functioning POS system by June 2022; and (3) provide the adequate two-week notice. [ECF No. 101 at 4].

Issues persist through Chetu's Motion, which fails to allege that there is no genuine issue of material fact on this claim. Additionally, Chetu's Statement of Facts in support of its Motion provides a bare recitation of the facts in this case, failing to discuss, for example, correspondence regarding the alleged November 18, 2021 and June 2022 deadlines on which it bases its argument for summary judgment.

Chetu argues that the first two breaches are "strawmen because [they] are not based on any duties required of Chetu under the contract." [*Id.* at 4]. It relies on the terms of the contract, which it argues does not require Chetu to deliver a defect-free application by an estimated deadline. [*Id.*].

---

[5] Because the undersigned is recommending that the district court grant summary judgment for Chetu's breach of the notice clause of the contract, the undersigned need not address Blue Chip's argument that Chetu waived the defense of anticipatory breach because it failed to plead it as an affirmative defense. [ECF No. 115 at 8].

Blue Chip counters that the contract and Work Orders expressly state that design and development of the services are based on specifications provided by Blue Chip. [ECF No. 109 at 6]. Therefore, it believes that the contract did *not* simply call for "consultants for software development." [*Id.*]. As before, the Court's review begins with the contract and Work Orders, which state as follows:

> 1) Description of Services. From time to time, on an as needed basis, Chetu agree to provide consultants for information technology services as are identified to Chetu by Customer. Such consultants and services shall be described in greater detail on Work Order to be attached hereto from time to time in the form of Exhibit A (the "Work Order").

> Description of Requested Services: Offshore consultants for software support, design and development based on specifications provided by Customer.

[ECF No. 86-1 at 1–4].

As previously addressed, the parties do not dispute the existence of the contract and two Work Orders. The disagreement here stems from the duties owed under the contract, which were *modified* as of October 22, 2021. The Court's February 17, 2023, order is instructive on this issue. [ECF No. 25]. There, in the context of Chetu's Motion to Dismiss, the district judge explained that both parties agreed to a modification to the contract when Mr. Sharma, Chetu's Director of Operations, proposed "an alternative path to the solution" which would require additional work to be performed at Plaintiff's expense. [*Id.* at 12]. The e-mail from Mr. Sharma, dated October 22, 2021, provided a "firm delivery date [of] **11/18**." [ECF Nos. 104 at ¶ 21; 104-1 at 15 (emphasis in original)]. In the order, the Court also found that Blue Chip adequately pled modification to the "as is" provision of the contract based on Chetu's continued representations that it would deliver a fully functioning POS system. [ECF No. 25 at 12].

Now, at the summary judgment stage, based on the undisputed facts, the undersigned agrees. The contract was modified after October 22, 2021, whereby Chetu promised to deliver a fully functioning POS system by November 18, 2021.  Indeed, it is a well-settled principle of

contract law that usually, "parties must agree to modifications of contracts and support the modification with additional consideration." *See Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1381 (S.D. Fla. 2014) (citing *In re Estate of Johnson*, 566 So.2d 1345, 1347 (Fla. Dist. Ct. App. 1990)). Here, additional payments were made—totaling approximately $150,000—in exchange for Chetu's promise, which it failed to keep for about eight months thereafter, through July of 2022, when Chetu ceased all work on the project. [ECF Nos. 104 ¶ 20; 108 ¶20]. The services provided by Chetu were to be "based on specifications provided by Customer[,]" Blue Chip. [*Id.* at 4]. Chetu and Blue Chip met on weekly Zoom calls to discuss various specifications, and Chetu provided deadlines for completing part, or all, of the project. [ECF No. 102 ¶ 8]. Thereafter, the contract was modified, whereby Chetu promised to deliver a fully functioning POS system by November 18, 2021. [ECF Nos. 104 at ¶ 21; 104-1 at 15]. Blue Chip paid Chetu in exchange for its services. [ECF Nos. 104 ¶ 20; 108 ¶20]. Therefore, as to the theory of liability for breach of contract related to the November 18, 2021, deadline, Chetu's argument that the breach related to "terms not agreed to" fails as a matter of law. [ECF No. 101 at 5].

Next, as to the theory of liability for breach of contract related to the June 2022 deadline, while Chetu fails to allege facts to support the claim that a fully functioning POS system would be completed by June 2022, Blue Chip, too, fails to allege in its opposition to the Motion or its opposing to the Statement of Material Fact that a deadline of June 2022 was agreed to. The undersigned will not address meritless and unsupported arguments and therefore denies Chetu's Motion on this theory of liability.

On Chetu's theory that the two-week notice provision was breached, it makes the same argument as it did in the opposition to Blue Chip's Motion: the alleged breach is merely a technical violation. [ECF No. 101 at 6]. The undersigned disagrees. The notice provision was a material

term, and Chetu breached the contract when it failed to provide the two-week notice to Blue Chip. [*See* Analysis § (B)(a)]. Therefore, Blue Chip is entitled to summary judgment on its theory that the notice provision of the contract was breached. The undersigned will address damages related to this breach in §E of this report.

### c.  *Chetu's Motion for Summary Judgment on its Breach of Contract Counterclaim (Count I)*

Chetu argues it has conclusively proven its counterclaim for breach of contract relating to Section 4 of the contract, which requires Blue Chip to tender payment for monthly invoices for Chetu's development services within fifteen (15) days. [ECF No. 101 at 16–17]. Blue Chip apparently failed to pay the June 2022 invoice in the amount of $4,825. [*Id.* at 17]. Blue Chip argues that it continued to pay all monthly fees billed and that Chetu was fully paid for all invoices owed up and through the date of Chetu's termination. [ECF No. 109 at 18]. The parties' confusion on pending payment (if any) is discussed at length in the preceding section regarding Blue Chip's request for declaratory judgment.

Summary judgment cannot be entered on this claim because Chetu failed to reallege it after the filing of the Second Amended Complaint. The Complaint in this action was filed on August 26, 2022. [ECF No. 1]. It was then amended on February 21, 2023. [ECF No. 26]. Chetu filed is Answer and Affirmative Defense to the First Amended Complaint, as well as its Counterclaim, on March 8, 2023. [ECF No. 27]. Blue Chip then moved to amend its First Amended Complaint in order to plead punitive damages. [ECF No. 72]. The district judge granted Blue Chip's request, ordering Blue Chip to amend is pleading. [ECF No. 84]. Blue Chip thereafter filed its (now operative) Second Amended Complaint on October 10, 2023. [ECF No. 86]. While Chetu filed its Answer and Affirmative Defenses to the Second Amended Complaint, the counterclaim for breach of contract was not realleged. [*See* ECF No. 96].

It is well established that, "[a]n amended complaint, once filed, normally supersedes the antecedent complaint." *Russell-Brown v. Univ. of Florida Bd. of Trustees*, 1:09-CV-00257-MP-GRJ, 2012 WL 1571393, at *3 (N.D. Fla. Mar. 21, 2012), *report and recommendation adopted*, 1:09CV257/MCR/GRJ, 2012 WL 3064242 (N.D. Fla. July 27, 2012)*; see also Fritz v. Standard Sec. Life Ins. Co. of N.Y.*, 676 F.2d 1356, 1358 (11th Cir. 1982) ("Under the Federal Rules, an amended complaint supersedes the original complaint."); *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1219 (11th Cir. 2007) ("[A]n amended complaint supersedes the initial complaint and becomes the operative pleading in the case."). Moreover, an "original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (quoting *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006)). Indeed, "positions taken only in the superseded pleading are no longer part of the case." *Cieutat v. HPCSP Investments, LLC*, CV 20-0012-WS-B, 2020 WL 4004806, at *2 (S.D. Ala. July 15, 2020).

Accordingly, because the Second Amended Complaint superseded the First Amended Complaint, Chetu's failure to reallege its previously asserted counterclaim is fatal, and the counterclaim is deemed abandoned. *See Bahama Bay II Condo Ass'n, Inc. v. United Nat'l Ins. Co.*, 374 F. Supp. 2d 1274, 1278 (M.D. Fla. 2019) (denying summary judgment because the counterclaim was not included in an answer and deemed abandoned); *Stonen Tech. (HK) Co., Ltd. v. GlobalGeeks, Inc.*, No. 20-cv-23251-Bloom/Louis, 2021 WL 86776, at *3–6 (S.D. Fla. Jan. 11, 2021) (same).

## C. <u>Fraud in the Inducement</u>

"Under Florida law, to state a cause of action for fraud in the inducement, a party must establish the following elements: 1) a false statement regarding a material fact; 2) the person

making the statement knew or should have known that the representation was false; 3) intent by the person making the statement to induce action or reliance; and 4) injury suffered because of justifiable reliance on the representation." *Int'l Star Registry of Illinois v. Omnipoint Mktg., LLC*, 510 F. Supp. 2d 1015, 1024 (S.D. Fla. 2007) (citing *Biscayne Inv. Group, Ltd. v. Guar. Mgmt. Servs., Inc.*, 903 So. 2d 251, 255 (Fla. 3d DCA 2005)). Florida law places the duty on one who undertakes to disclose material information "to disclose the information fully." *Gutter v. Wunker*, 631 So.2d 1117, 1118–19 (Fla. 4th DCA 1994).

      a.   **_Blue Chip's Motion for Summary Judgment on its Fraud in the Inducement Claim (Count III)_**

Blue Chip's Second Amended Complaint alleges one count for fraud in the inducement based on more than one theory of liability and relies on both pre- and post-contract formation representations. [ECF No. 86 at 20–22].[6] As to Chetu's post-formation representations, Blue Chip alleges that Mr. Sharma made false representations to induce Mr. Howe and Blue Chip to continue paying the monthly development fees after Chetu failed to deliver the software application by the "firm delivery date" of November 18, 2021. [ECF No. 86 at ¶ 74]. Specifically, Blue Chip asserts that the following representations were made:

1. an "elite technical council team" had been assigned specifically to Blue Chip's project in order to rapidly resolve ongoing technical issues with the POS application and that the team had made progress on resolving such issues;

2. the Paycheck and Netspend integrations were done and were simply waiting for testing and fixing missed scenarios;

3. Chetu was close to delivering a stable POS application.

4. Simmi and Mangaldeep continued to make knowingly false representations to Mr. Howe in order to induce Blue Chip to continue paying monthly development fees by sending regular "progress" reports, which falsely

---

[6] Blue Chip's pre-formation allegations were dismissed by the district judge. [*See* ECF No. 25 at 12–13].

represented the progress of the software allegedly being developed for Blue
Chip.

[*Id.*].

Blue Chip moves for summary judgment on two theories: (1) Chetu's alleged false
statement about the functionality of Blue Chip's original POS software, which led to Phase II of
the project; and (2) Chetu's promised—and missed—completion dates, which Blue Chip relied on
in exchange for additional payment. [ECF No. 103 at 9–17].

On the first theory, Blue Chip argues that Mr. Tripathi assured Blue Chip that Chetu had
the requisite skills and experience to integrate the Blue Chip POS with Netspend and Paychex
APIs and that work would be completed within a few months. [*Id.* at 9]. Several deadlines were
provided to Blue Chip, as discussed in the undisputed facts of this report. [*Id.* at 10]. Blue Chip
also claims that its representatives were told that its existing POS system was "antiquated" and
could not support the integration. [*Id.*]. This statement, Blue Chip claims, was false. [*Id.*]. Blue
Chip relied on this statement and its payment of $124,000 for an additional sixteen months of
work. [*Id.* at 11]. On the second theory, Blue Chip believes that Chetu "continued a habitual and
calculated pattern of fraud concerning the length of time needed to complete [a redevelopment of
the system]." [*Id.* at 13]. It alleges that Chetu lied to Blue Chip when it stated it would complete
developing different phases of the project, by, for example November 18, 2021 and December 3,
2021. [*Id.* at 14]. These allegedly false statements induced Blue Chip to continue paying Chetu a
monthly $9,000 development fee. [*Id.*].

Conversely, Chetu argues that a genuine dispute of material fact remains. [ECF No. 107 at
4]. First, it argues that extra-contractual representations did not amend the contract and Work
Orders, which did not provide any deadlines for completion of the project. [*Id.*]. Second, the
estimates provided were allegedly nothing more than "future project completion deadlines based

on information then-available to Chetu." [*Id.*]. Chetu cites to two cases, *Extreme Crafts VII, LLC v. Cessna Aircraft Co*., 2011 U.S. Dist. LEXIS 163003 (S.D. Fla. 2011) and *Zarella v. Pac. Life Ins. Co.,* 755 F. Supp. 1218 (S.D. Fla. 2010), for the contention that opinions regarding future actions, without intent or knowledge that the opinion is false, cannot form a basis for fraud. [ECF No. 107 at 5]. Chetu therefore argues that there is no evidence that it knew any of its estimates were false when it made them. [*Id.* at 6].

The undersigned finds that there is a factual dispute as to both theories, precluding summary judgment on Blue Chip's fraud claim.

First, on the theory that Chetu made false statements as to its existing POS system, the parties present controverting evidence regarding whether or not Blue Chip *must* (as alleged by Blue Chip) or *may but was not required to* (as alleged by Chetu) rebuild the POS system and therefore begin Phase II of the project. Blue Chip takes the position that Chetu stated—unequivocally—that the existing POS system could not support the integration of Netspend or Paychex APIs. [ECF No. 103 at 10]. Conversely, Chetu takes the position that the proposal to initiate Phase II was a mere option presented to Blue Chip. [*Compare* Blue Chip's Statement of Facts at ECF No. 104 ¶ 15 ( "Chetu explained that the only available choices were for Blue Chip to walk away from the work done with nothing to show . . . or let Chetu create a new version of the POS, which would supposedly easily integrate the [APIs] that Chetu had already developed."), *with* Chetu's Opposing Statement of Facts at ECF No. 108 ¶ 15 ( "Mr. Tripathi recommended to rebuild the POS from scratch because the outdated version of JavaFX that the existing application was built was causing problems with integration.").

Opinions vary as to whether a rebuild of Blue Chip's POS was required. On the one hand, Blue Chip's expert, Paul Reimer, opined that Blue Chip could have integrated its POS with the

requested Netspend and Paychex APIs. [ECF No. 104-2 at ¶¶ 8–10]. Mr. Sharma supports this contention. [ECF No. 104-3 at 191:15–19]. On the other hand, Jared Strand, the develop who built the prior POS for Blue Chip, advised against rebuilding the POS because he believed the application he built was sufficient. [ECF No. 107-4 at 194:4–13].

But the heart of the factual dispute lies in the discussion that took place on a late May or early June 2021 Zoom call between representative of both companies, where, according to Blue Chip, Mr. Tripathi stated that the existing POS system was antiquated and could not support integration of the two APIs. [ECF No. 103 at 10]. Two Blue Chip employees that attended the Zoom meeting submitted declarations in support of Blue Chip's position. [ECF Nos. 104-4, 104-5]. Mr. Sharma, who was not present at the Zoom meeting, stated in his deposition that he had a discussion with Mr. Tripathi prior to the meeting regarding the "propos[al,]" indicating that a choice indeed was given. [ECF No. 107-3 at 100:6–22].

Clearly, there is disputed issues of material fact as to whether (1) what was indeed stated in the Zoom meeting in question; (2) whether that statement was a false (2) whether Chetu intended to induce Blue Chip to begin Phase II by this alleged misrepresentation. Similarly, on the theory that Chetu's continued promises that it would complete the project by future deadlines, there is a dispute as to whether the promised deadlines were false statements intended to induce Blue Chip to continue paying a monthly fee for Chetu's services. As such, Blue Chip's Motion on its two theories of fraud in the inducement should be denied.

  **b.** ___Chetu's Motion for Summary Judgment on Blue Chip's Fraud in the Inducement Claim (Count III)___

Chetu's Motion alleges that both of Blue Chip's pre-contract formation allegations are not actionable. [ECF No. 101 at 6–7]. As explained above, the district judge dismissed all allegations relating to pre-contract formation. [*See* ECF No. 25 at 12–13]. On the post-contract formation

representations, Chetu expands on its argument made in opposition to Blue Chip's Motion that the estimated deadlines were good faith opinions providing estimated future project completion deadlines. [ECF No. 101 at 7–8]. And, in any case, Chetu argues the future promises are "unactionable because the requisite fraudulent scienter was not present." [*Id.* at 9]. On Blue Chip's allegation that Chetu failed to provide elite technical council, Chetu cites to Exhibit 6 of its Motion, which evidences that "Chetu has produced documentation regarding the elite technical council and its assignment to this case." [*Id.* at 9, citing to ECF No. 101-6]. Blue Chip apparently rejected Chetu's proposed implementation of a "test drive" development approach for the project. [ECF Nos. 101 at 9; 101-2 at 245:15–17].

First, on whether the deadlines are actionable as fraud claims, the undersigned found that a dispute exists as to whether the deadlines were indeed false statement intended to induce further payment. Second, Chetu's production of documents as to the elite technical council and Blue Chip's apparent rejection of Chetu's proposed "test drive" development approach, does nothing to advance its argument.[7] Chetu fails to explain how its discovery responses and Blue Chip's decision regarding the alleged "test drive" moves the needle in its favor on summary judgment. Accordingly, Count III shall proceed to trial for determination by a jury.

### D.  **FDUTPA**

A party asserting a FDUTPA claim must prove: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Jones Superyacht Miami, Inc. v. M/Y Waku*, 451 F. Supp. 3d 1335, 1343 (S.D. Fla. 2020) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). The statute outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1),

---

[7] Chetu's failure to pincite its 11-page discovery responses only exacerbates its argument.

Fla. Stat. "A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting *Rollins*, 951 So. 2d at 869).

> a. ***Blue Chip's Motion for Summary Judgment on its FDUTPA Claim (Count IV)***

Blue Chip advances two arguments in support of its FDUTPA claim: (1) the non-disparagement provision of the contract (Section 6) is a *per se* violation of the FTC Act, and, consequently, is also a violation of FDUTPA; and (2) Chetu's fraudulent statements made to Blue Chip regarding the need to jettison its existing POS system for a new and more expensive POS in order to string Blue Chip along into paying monthly development fees is the definition of unscrupulous conduct defined by FDUTPA. [ECF No. 103 at 17–18].

Here, the parties failed to address a key issue related to Blue Chip's FDUTPA claim: the district judge's partial dismissal of the claim. On February 17, 2023, Judge Smith analyzed Blue Chip's FDUTPA claim in the context of Chetu's Motion to Dismiss the Complaint. [ECF Nos. 10, 25]. Crucially, the Court found that "[e]nforcing the SLAPP clause of the Software Contract also cannot form the basis of a FDUTPA claim because there is nothing fraudulent or unfair in enforcing a term of a contract entered into by two business entities." [ECF No. 25 at 14–15 (emphasis added)]. However, the Court held that the remaining allegations—false representation about the skills and experience of employees, false progress reports provided to customers, and dragging out of the development process to generate additional fees—were sufficient to state a

FDUTPA claim. [*Id.* at 15]. The court therefore dismissed Count IV in part, without granting leave to replead.[8]

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618  (1983)); *see also Fontainebleau Hotel Corp. v. Crossman*, 286 F.2d 926, 928 (5th Cir. 1961) ("The rule of the law of the case is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." (citation omitted)).

While the Court has "the power to revisit prior decisions of its own or of a coordinate court in any circumstance" the rule of thumb is that "courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice." *Arencibia v. AGA Serv. Co.*, 533 F. Supp. 3d 1180, 1192–93 (S.D. Fla. 2021), *aff'd*, 21-11567, 2022 WL 1499693 (11th Cir. May 12, 2022) (quoting *Christianson*, 486 U.S. at 818); *see also Royal Ins. Co. v. Latin Am. Aviation Servs., Inc.*, 210 F.3d 1348, 1350 (11th Cir. 2000) (recognizing narrow exceptions to the law of the case doctrine: new evidence brought to the court's attention, change in the law, and the earlier decision was a "clear error" that "would work a manifest injustice."); *Cox Enterprises, Inc. v. News-J. Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015) (the Eleventh Circuit has "emphasized that the 'clear error' exception must be rarely invoked. . . . [I]n a close case, a court must defer to the legal conclusion of a coordinate court in the same case; only when the legal error is beyond the scope of reasonable debate should the court

---

[8] Note that Count I was dismissed *without* prejudice: "Chetu's Motion is granted as to Count I with leave to replead" and was "dismissed without prejudice." [ECF No. 25 at 10, 15]. No such language is used in the Court's dismissal of Count II and partial dismissal of Counts III and IV.

disregard the prior ruling. Needless to say, this is a high bar." (quotation marks omitted) (footnotes omitted)).

Here, Blue Chip makes the same allegations against the same party on a previously dismissed theory under FDUTPA. While the Court addressed this theory in its Order denying Chetu's Motion for Judgment on the Pleadings, including stating that "Plaintiff has alleged a violation of 15 U.S.C. § 45(b)," that did not revive the previously dismissed claim. [ECF No. 129]. The Court did not address any "new evidence" or a "change in the law[,]" and neither party addressed whether the district judge's decision, although brief in analysis, was a "clear error" that "would work a manifest injustice." *Royal Ins. Co.*, 210 F.3d at 1350. The inclusion of these allegations in First Amended Complaint and Second Amended Complaint likewise did not revive these theories, and the parties were not granted leave to replead them. Therefore, the undersigned cannot recommend entry of summary judgment on Blue Chip's first theory regarding the non-disparagement provision (SLAPP clause) of the contract, where the district judge specifically held that this theory "cannot form the basis of a FDUTPA claim.. . ." [ECF No. 25 at 14–15].

Next, Blue Chip alleges that Chetu made fraudulent statements intended to string Blue Chip along to continue paying a development fee. [ECF No. 103 at 18]. It argues that a constant "bait and switch" tactic was utilized, whereby Chetu promised firm deadlines in exchange for additional payment. [*Id.*]. This, Blue Chip believes, "is the height of deceptive practices" and "is exactly the type of conduct that FDUTPA is meant to protect a consumer, such as Blue Chip, from having to endure." [*Id.*]. As a direct and proximate cause, Blue Chip believes it is entitled to $156,000 in damages. [*Id.*].

Chetu failed to respond to the allegation, deciding instead to address the other theories identified in the Second Amended Complaint, on which Blue Chip did not request entry of

summary judgment on in its Motion. Chetu identified the allegation, but failed to discuss it. [*See* ECF No. 107 at 8 (listing, but not analyzing, the allegation that "Chetu's entire business model is to induce customers into a monthly development fee and then to drag out the development process indefinitely in order to generate fees.")].

However, despite these issues, this theory does not withstand summary judgment scrutiny. There is no evidence (disputed or undisputed) supporting the contention that Chetu committed an unfair and deceptive practice by proposing alternate deadlines for partial or full completion of the project. The only case cited in support in Blue Chip's analysis, *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003), discusses whether FDUTPA may be applied in a private cause of action arising from unfair or deceptive acts. This case supports Blue Chip's ability to bring the action but does not support the crux of its argument: that Chetu's practice was "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [*Id.* (citations omitted)]. As such, Blue Chip's Motion on its FDUTPA claims under the theories addressed above is denied.

### b.  *Chetu's Motion for Summary Judgment on Blue Chip's FDUTPA Claim (Count IV)*

Chetu's Motion is a cut-and-paste of its opposition to Blue Chip's Motion. [ECF No. 101 at 11–14]. It seeks summary judgment on the second and fifth allegations in Blue Chip's Second Amended Complaint: "(2) "Chetu falsely represents that it dedicates an entire team of qualified professionals, including 'elite technical teams,' to each project;" and "(5) Chetu aggressively enforces the nondisparagement clause in the Software Contract to prevent dissatisfied customers from warning potential customers of Chetu's practices." [*Id.* at 11].

First, theory number 5 refers to Chetu's alleged enforcement of the SLAPP Clause. [ECF No. 86 ¶ 82]. As discussed at length in the preceding section, the district judge dismissed this theory of Blue Chip's breach of contract claim. [*Id.* at 14–15].

Second, on theory number 2, the district judge found in its Order on Chetu's Motion to Dismiss that "Chetu's representations that it dedicates an entire team of professionals to each project cannot form the basis of a FDUTPA claim because the Work Order . . . expressly states that Plaintiff is contracting for a single consultant for its work." [ECF No. 25 at 14]. Nearly a year later, the district judge entered an Order on Chetu's Motion for Judgment on the Pleadings and clarified that, on this specific theory, its previous dismissal was "based on pre-contract representations" and that Plaintiff's allegations are actually based on post-contract representations. [ECF No. 129 at 12].[9] As such, the Court must address Chetu's post-contract representation that it dedicates an entire team of qualified individuals to each project. [ECF No. 86 at 23].

Chetu argues that its post-contract formation representations are mere promises not performed, which, in the context of fraud, are not actionable, citing *Alexander/Davis Props., Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. 4th DCA 1981) ("As a general rule, fraud cannot be predicated upon a mere promise not performed.") and *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 825 (Fla. 4th DCA 2010) ("FDUTPA claim cannot be stated based upon oral representations which are in contradiction of written terms of a contract, because reliance on such representations is unreasonable as a matter of law."). [ECF No. 101 at 11–12]. Alternatively, Chetu proposes that these representations constitute an offer of additional services, or a proposal for contract modification, for which no additional compensation was received and the requirements

---

[9] Notably, the Court did not specify whether its dismissal of theory number 5 (regarding the SLAPP clause) was based on pre- or post-contract representations.

of amending the contract were not followed. [*Id.*]. In support, it cites to another state court case, *Diaz v. Kosch*, 250 So. 3d 156, 165 (Fla. 3d DCA 2018) (holding contract was not validly amended where "Buyers were memorializing their claim that the inspection/cancellation period had been extended but without a signed writing or on the basis of additional consideration by the Buyers").

Blue Chip argues that Chetu's Motion on this theory should be denied because the Second Amended Complaint does not allege, or even refer to, an "elite technical team" under this theory of its FDUTPA claim. [ECF No. 109 at 13]. Regarding Chetu's post-contract formation representations, it argues that Chetu's reliance on *Dorenstin* is misplaced because the oral representations in that case were made prior to the parties' written contract with contradictory language, and, therefore, reliance on these oral assertions could not be considered reasonable. [*Id.* at 13]. Blue Chip also cites to *Kukorinis v. Walmart*, 2020 WL 13388297, at *5 (S.D. Fla. June 1, 2020), which it says distinguished *Dorestin* because "the alleged deceptive and unfair conduct . . . . has nothing to do with an agreement between the parties"). Blue Chip then summarizes other theories of FDUTPA unrelated to the one discussed by Chetu and concludes that "the record presents a very different version of reality than Chetu presents concerning the competency, makeup, and diligence of the team that Mr. Sharma and Mr. Tripathi repeatedly promises to Blue Chip after the contract was signed." [*Id.* at 14–15]. Its analysis continuous in a footnote. "Chetu made post-contractual statements concerning the skill and dedicated team of professionals. . . . This was not a change in the parties' contract as Blue Chip always controlled the specifications of work to be performed." [*Id.* n. 9].

Turning to the record and undisputed facts, the Work Orders states that "[e]ach consultant is allocated as a Full Time equivalent for this Work Order and billing is fixed to 8 hours per day. The consultant(s) work Monday through Friday and alternate Saturdays." [ECF No. 86-1 at 4; 27-

1 at 3–4]. Under "Description of Requested Services" it states "[o]offshore consultants for
software support, design and development based on specifications provided by Customer." [*Id.*].
The number of consultants (one) and consultant hourly date ($25 per hour) is also included. [*Id.*].
Mr. Howe's declaration states that after the contract was entered into, Mr. Tripathi and its
developers assured Blue Chip that the company had the requisite skill and experience to easily
integrate the Blue Chip POS with the two APIs. [ECF Nos. 109 n. 9, citing 104-1 ¶ 4]. Then, a
May 27, 2021 internal e-mail at Chetu stated that "the project is in Yellow and we need to show
some progress and team is new in JFX and taking longer than expected. We need your help to
expedite the learning curve to get some deliveries to the customer ASAP." [ECF No. 104-6 at 1].
It further states that the "[t]eam is new in JFX and taking longer than expected." [*Id.*].[10]

Blue Chip is correct that the operative complaint fails to allege that Chetu made false
representations regarding an "elite technical team." [ECF No. 86 at 22–23]. But this is not fatal to
its Motion on this count. Certainly, Chetu also analyzes, and cites to, the operative complaint's
reference to Chetu's "entire team of qualified persons to each project" in the context of the
FDUTPA claim. [*See* ECF No. 86 at ¶ 82].

Blue Chip states that the post-contract statements regarding the Chetu team were *not*
modifications to the contract because Blue Chip always controlled the specifications of the work
to be performed, per the terms of the Work Orders. [ECF No. 109 at 15]. Indeed, even if Mr.

---

[10] "[A] court must consider each motion on its own merits, resolving all reasonable inferences
against the party whose motion is under consideration." *Torres*, 244 F. Supp. 3d at 1327–28. But
Blue Chip's opposition cites to exhibits used in support of *its own* Motion for Summary Judgment
and Statement of Facts, rather than those relevant to *Chetu's* Motion. To exacerbate the parties'
errors in their briefings, Chetu failed to file a reply in support of its Motion, which could have
clarified whether certain facts relevant to its Motion are disputed or not. In any case, the Court
cites to the record, and Mr. Howe's declaration is cited in Blue Chip's response to Chetu's material
facts, in the "additional facts" section. [ECF No. 110]. These additional facts are deemed admitted
due to Chetu's failure to respond. *See* Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(b)–(d).

Tripathi's statements assuring the company's skill and experience were taken as true, it would not amend the terms of the contract, per Section J of the contract providing the process for modifications. Instead, Blue Chip relies on the argument that "no case stands for the proposition that post-contractual statements cannot be relied upon to support a FDUTPA claim[,]" citing to *Kukorinis*, 2020 WL 13388297 at *5. [ECF No. 109 at 14]. Put simply, Blue Chip attempts to distance itself from the terms of the contract and relies solely on alleged separate, unrelated, post-contractual statements.

This argument fails. In *Kukorinis*, the plaintiff brought a class action suit against Walmart for alleged unfair, deceptive, and unconscionable business practices relating to certain overcharged goods that resulted in increased profits for Walmart. 2020 WL 13388297 at * 1. Certainly, the court there distinguished the case from others, including those cited in Chetu's Motion, because the FDUTPA claim was *not* premised on an agreement between the parties. [*Id.* at *5]. Blue Chip's response brief fails to mention that *no contract existed* between the parties in that case. In other words, the FDUTPA claim there did not center on post-contract formation representations; it centered on mere representations. The instant action is different. The parties' Work Orders expressly provides for a description of requested services, which includes consultants for software support, design, and development. [ECF No. 86-1 at 4]. The contract disclaimed any pre-contract representations and provided for modifications through a written agreement signed by both parties. [*Id.* at § J]. No modifications to the contract were made regarding consultants. It follows that Chetu's post-contract representations that touch on a subject of the contract—consultants hired to work on the project—cannot form the basis of a FDUTPA claim. *See TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784–785 (Fla. 2d DCA 2009) (barring a FDUTPA claim based on reliance of alleged misrepresentations where parties entered into a contract disclaiming any

prior representations); *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368–1369 (S.D. Fla. 2003) (dismissing a FDUTPA claim because it was unreasonable to rely on alleged misrepresentations that differentiated from the written contract); *JustTech, LLC v. Kaseya US LLC*, 22-22454-CIV, 2023 WL 5529845, at *10 (S.D. Fla. Aug. 28, 2023) ("Plaintiff cannot rest its FDUTPA claim on Defendant's alleged misrepresentations of its software and services or promises of restitution because there presentations were superseded by the [Agreement .. . .]"). Therefore, Chetu's Motion is granted on Blue Chip's FDUTPA claim only as to the theory that Chetu falsely represented that it dedicates an entire team of qualified professionals to each project.

**E.** ***Damages***

As discussed, the undersigned recommends granting summary judgment on Blue Chip's breach of contract claim on its theory that Chetu breached the notice provision of the contract. [*See* Analysis § (B)(a)].

Blue Chip seeks $156,000 in damages for the breach. [ECF No. 103 at 7]. It argues that damages in this amount would place it in the same position as it would have been in but for the breach. [*Id.*]. Under the "benefit of the bargain" standard, it argues the amount would be no different. [*Id.*].

Unsurprisingly, Chetu believes that Blue Chip is entitled to nothing in damages for this breach, stating that Blue Chip agreed to hold Chetu harmless from liability for any consequential and punitive damages, pursuant to Section 9 of the contract. [ECF No. 107 at 3–4]. The measure of damages, it believes, "is effectively what would be provided for if the contract were rescinded, rather than what would adequately compensate Blue Chip for the harm it purportedly endured." [*Id.* at 4]. Chetu concludes that such damages are not available because "the status quo cannot be restored and Blue Chip never provided the requisite notice of rescission to Blue Chip[,]" citing

*Reyes v. Foreclosure Asset Sales & Transfer P'ship*, 13-22829-CIV, 2014 WL 12623071 (S.D. Fla. Mar. 5, 2014). In its reply, Blue Chip argues that no punitive damages or consequential damages are sought on the breach of contract claim. [ECF No. 115 at 9–10].

The applicable sections of the contract state:

9) <u>Limitation of Liability</u>. Under no circumstances, including negligence, will either party, be liable to the other or any other party for any incidental, special, indirect, reliance, punitive or consequential damages, including lost data, lost revenue, or lost profits, arising out of or relating to the software, developed or maintained as part of this agreement, or the services, even if such party has been advised of the possibility of such damages.

12<u>) General Provisions</u>:
d) Any breach of any provision of the Agreement, including non-payment for services, by either party shall entitle the other party to recover damages and injunctive relief. Customer and Chetu agree that because monetary damages are likely to be inadequate, the party shall be entitled to temporary injunctive relief (by providing to a court a likelihood of breach by Customer) and to permanent injunctive relief (by providing to a court such breach). If the first party is successful in recovering damages or obtaining injunctive relief, the second party agrees to be responsible for paying all of the first party's expenses. In seeking such relief, including all costs of bringing suit and all reasonable attorneys' fees.

[ECF No. 86-1 at ¶¶ 9, 12].

"Under Florida law, the purpose of breach of contract damages is to restore an injured party to the same position that he or she would have been in had the contract not been breached." *Sun Life Assurance Co. of Canada v. Imperial Holdings Inc.*, 13-80385-CIV, 2016 WL 10565034, at *4 (S.D. Fla. Sept. 22, 2016) (citing *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.,* 25 So. 3d 593, 596 (Fla. 1st DCA 2009)). However, restoring the injured party to the "same position" does not allow for putting the party in a position better than that which he would have occupied had the breach not occurred. *Lindon v. Dalton Hotel Corp.*, 49 So. 3d 299, 305–06 (Fla. 5th DCA 2010). Rather, the only damages that are recoverable are those that flow naturally from the breach and

can "reasonably be said to have been contemplated by the parties at the time that the contract was made." *Id.* (citations omitted).

"Recoverable damages are inclusive of 'all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract.'" *Christie v. Royal Caribbean Cruises, Ltd.*, 497 F. Supp. 3d 1227, 1233 (S.D. Fla. 2020) (quoting *Capitol Env't Servs.*, 25 So. 3d at 596). "Damages are foreseeable if they are the proximate and usual consequence of the breaching party's acts." *Id.* (internal quotation marks omitted).

Chetu argues that the contract did not require the delivery of a completed product. [ECF No. 107 at 3]. Certainly, Section 8 of the contract states that "Customer expressly acknowledges and agrees that Chetu is providing consultants for software development and maintenance services and not the end product(s) ("complete or any part of software developed as part of these services") itself." [ECF No. 86-1 at ¶ 8]. However, as discussed at length in this report, the undersigned finds, in agreement with the district judge's order on Chetu's motion to dismiss, that the contract was modified when Chetu provided for a "firm delivery date [of] 11/18" and made representations that it would deliver a fully functioning POS system. [ECF Nos. 104 at ¶ 21; 104-1 at 15]. And while a fully functioning POS system was not contemplated in the original contract, "it is *not* necessary that the parties 'contemplated the exact injury which occurred as long as the actual consequences could have been reasonably expected to flow from the breach.'" *Christie*, 497 F. Supp. at 1233–34 (quoting *Capitol Env't Servs.*, 25 So. 3d at 596). It is undisputed that "Blue Chip originally hired Chetu for the sole purpose of fully integrating Blue Chip's existing [POS] system . . . into the Netspend and Paychex [APIs], which became known later as Phase I of the software project." [ECF Nos. 104 at ¶ 6; 108 at ¶6]. Thus, the modification of the contract and the undisputed facts

support the conclusion that the injury suffered by Blue Chip—failure to receive a fully functioning POS system—was contemplated from the earliest stages of the project. Blue Chip argues, and Chetu does not dispute in its opposition, that Chetu provided no software code, let alone usable code. [ECF No. 104 n. 2]. Blue Chip is therefore required "to start from scratch" if it were to seek receipt of a fully functioning POS system. [*Id.*].

Chetu's arguments are thin on both case law and analysis. First, Blue Chip is not seeking consequential or punitive damages, as Chetu alludes to. It also did not plead rescission and, to the undersigned's knowledge, is not required to in order to be "placed in the same position that [it] would have been in had the contract not been breached." *Sun Life Assurance Co. of Canada*, 2016 WL 10565034 at \*4. The only case Chetu relies on goes to the notice requirement parties must follow before rescinding a contract, which is inapposite to the instant action. *Reyes*, 2014 WL 12623071 at \*5.

In sum, Blue Chip did not receive a fully functioning POS software with Netspend and Paychex APIs fully integrated, as contemplated by the parties. Blue Chip is entitled to damages of $156,000, the total amount paid to Chetu.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Chetu's Motion for Summary Judgment [ECF No. 101] be **GRANTED IN PART** and **DENIED IN PART** as follows:

- Blue Chip's request for Declaratory Judgment (Count I): **DENIED**;

- Blue Chip's Breach of Contract Claim (Count II): **DENIED**;

- Blue Chip's Fraud in the Inducement Claim (Count III): **DENIED**;

- Blue Chip's FDUTPA Claim (Count IV): **GRANTED** on Blue Chip's theory that Chetu falsely represented that it dedicates an entire team of qualified professionals to each project.

**DENIED** on the theory that Chetu aggressively enforces the SLAPP Clause as one that was previously dismissed by the district judge;

-   Chetu's Breach of Contract Counterclaim (Count I): **DENIED**. The Court notes that Chetu abandoned its counterclaim by failing to reallege it in its Answer and Affirmative Defenses to the Second Amended Complaint.

It is further **RECOMMENDED** that Blue Chip's Motion for Summary Judgment [ECF No. 103] be **GRANTED IN PART** and **DENIED IN PART** as follows:

-   Blue Chip's Breach of Contract Claim (Count II): **GRANTED** on its theory that the contract's termination clause was breached. Blue Chip is entitled to damages amounting to **$156,000** for Chetu's breach.

-   Blue Chip's Fraud in the Inducement Claim (Count III): **DENIED**;

-   Blue Chip's FDUTPA Claim (Count IV): **DENIED**. The Court again notes that Blue Chip's theory that Chetu aggressively enforces the SLAPP Clause was previously dismissed by the district judge.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 8th day of August 2024.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:    **U.S. District Judge David S. Leibowitz; and**

       **All Counsel of Record**