UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:22-cv-61602-LEIBOWITZ/REID

BLUE CHIP ALLIANCE, LLC
d/b/a THE MAN SHOP,

> *Plaintiff,*

v.

CHETU, INC.,

> *Defendant.*

_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant Chetu, Inc.'s Motion to Preclude or Limit the Expert Testimony of Paul Reimer (the "Motion") [ECF No. 152]. The Court held a Daubert Hearing on the Motion on September 17, 2024, at which counsel for Plaintiff and Defendant appeared. [*See* ECF No. 186]. For the reasons stated below, the Motion [ECF No. 152] is **GRANTED IN PART and DENIED IN PART**.

## I.      Background

Blue Chip Alliance, LLC ("Blue Chip" or "Plaintiff") owns and operates modern-day barber shops (in at least some instances, doing business as "The Man Shop") in Washington and Montana. [Second Amended Complaint, ECF No. 86 ¶ 9]. To enhance its customer experience, Blue Chip wanted a software development team to create and improve its customer loyalty and scheduling experiences and to automate payroll and other administrative matters. [*Id.* ¶ 10]. In November 2020, Blue Chip began conversations with Chetu, Inc. ("Chetu" or "Defendant") to see if Chetu could develop the software applications sought by Blue Chip. [*Id.* ¶ 11]. Over the course of the next few months, Blue Chip and Chetu had subsequent conversations to discuss details of the potential engagement. [*Id.* ¶¶ 12–17]. In early February 2021, representatives from Blue Chip and Chetu

discussed the scope of the engagement, including that Chetu would set up Application Programming Interfaces ("API's") with Blue Chip's current payroll provider, integrate Blue Chip's credit card processing directly into its Point-Of-Sale ("POS") system, and develop a loyalty mobile application. [*Id.* ¶ 18]. These conversations prompted Blue Chip to agree to retain Chetu to develop their required software solutions. [*Id.* ¶ 19]. Blue Chip executed the Software Contract with Chetu on February 17, 2021. [*Id.* ¶ 21].

In March 2021 Chetu started work on modifications and additions to Blue Chip's POS system. [*Id.* ¶ 25]. Early on, Chetu made a positive impression on Blue Chip because of its frequent progress reports that showed continual progress in development. [*Id.*]. Blue Chip relied on these reports in paying their monthly development fees and adding more features to the project for Chetu. [*Id.*]. After several months, it became clear that the applications Chetu built were not compatible with Blue Chip's POS as they did not perform properly. [*Id.* ¶ 26]. Chetu convinced Blue Chip that the reason for this was that Blue Chip's original POS system was antiquated and that Chetu should code a new POS system for Blue Chip. [*Id.*]. Thus, in June 2021, Blue Chip agreed to pay Chetu to code an entirely new POS system. [*Id.* ¶ 27].

Chetu represented that the new POS system would be completed by the first week of October 2021, and over the next several months Chetu repeatedly assured Blue Chip through emails, calls, and regular progress reports that all the development work would be completed by that time. [*Id.* ¶¶ 27, 29]. Chetu then missed the promised delivery date without notice or warning. [*Id.* ¶ 29]. During an October 22, 2021, phone call between Chetu and Blue Chip, a Chetu representative explained that there were unexpected technological issues and that they could not determine a deadline based on the current approach, as more research was needed. [*Id.* ¶ 30]. Chetu proposed an alternative path to the solution, which required additional work to be performed at Blue Chip's expense, and Chetu promised

a firm delivery date of November 18, 2021. [*Id.* ¶ 31]. Subsequently, Chetu did not deliver a functioning POS system on November 18, 2021, as promised. [*Id.* ¶ 39].

Over the next several months, various members of the Chetu team repeatedly represented to Blue Chip that Chetu was making progress on the new POS system and that it would be delivered shortly. [*Id.* ¶ 40]. On April 1, 2022, Chetu and Blue Chip had a phone call to discuss the status of the project. [*Id.* ¶ 42]. Based on Chetu's repeated assurances that it was on the verge of delivering the new POS system, Blue Chip continued to pay the monthly development fee. [*Id.* ¶ 45]. Finally, in early May 2022, Chetu informed Blue Chip that the POS application was ready for demonstration and scheduled a meeting for May 12, 2022, to discuss the project—only to cancel the meeting the following day. [*Id.* ¶¶ 46–47].

On June 3, 2022, Chetu attempted to roll out the POS system, but it failed. [*Id.* ¶ 48]. Blue Chip and Chetu met again to discuss the project, and Blue Chip agreed to give Chetu an additional two weeks to deliver a stable POS. [*Id.* ¶ 50]. Chetu did not deliver the stable POS application as promised within those two weeks and instead sent Blue Chip a two-page list of deliverables and a timeline for each—with the earliest deliverable promised by June 30, 2022, and the final deliverables promised by July 28, 2022. [*Id.* ¶ 51]. On July 13, 2022, Blue Chip sent a letter through its counsel confirming the delivery schedule and requesting Chetu state whether it intended to meet each of the deliverable schedules as promised. [*Id.* ¶ 53]. On that same date, without providing Blue Chip with two-weeks' written notice as required by the Software Contract, Chetu terminated the agreement effective immediately without providing any of the deliverables as promised. [*Id.* ¶ 54].

On August 26, 2022, Blue Chip brought this action against Chetu. [ECF No. 1]. Blue Chip filed its Second Amended Complaint on October 10, 2023, for declaratory relief and damages. [ECF No. 86]. Blue Chip "seeks a determination that it does not infringe any purported copyrights held by Chetu in certain software applications and/or code under 17 U.S.C. § 501, and that Blue Chip is an

authorized licensee of such software applications and code as a matter of contract." [*Id.* ¶ 1]. Blue Chip also brought this "action for breach of contract, fraud in the inducement, and unlawful and deceptive business practices arising from Chetu's pattern and practice of inducing customers into paying monthly development fees without either the competency or ability to deliver stable and non-defective software applications to its customers. [Blue Chip] … believes that it is just one of hundreds of victims of Chetu's fraudulent, unfair, and deceptive business practices." [*Id.* ¶ 2].

Blue Chip retained Paul Reimer as an expert in this case to help prove its claims. Mr. Reimer was asked to opine on the following:

1. The two "API's Netspend/Paychex" created by Chetu from March 2021 to May 30, 2021, did they function?
2. Did the POS provided by Chetu as of July 2022 meet any of the requirements outlined in the "Redevelopment Outline."
3. Was the Blue Chip Alliance POS written in a coding language that was capable of following for integration of the required Netspend/Paychex API's?

[ECF No. 100-6 at 4]. Chetu seeks to limit Mr. Reimer's testimony and filed its Motion to Preclude or Limit the Expert Testimony of Paul Reimer on June 6, 2024. [ECF No. 152]. On June 19, 2024, Blue Chip filed its Opposition to Chetu's Motion to Preclude or Strike the Expert Testimony of Paul Reimer. [ECF No. 154]. On June 26, 2024, Chetu filed its Reply in Support of its Motion to Preclude or Limit the Expert Testimony of Paul Reimer. [ECF No. 159].

In its Motion, Chetu argues that Mr. Reimer "has failed to acquire the necessary knowledge and information to enable him to provide competent expert testimony in this case[,]" his "testimony will not assist the trier of fact in any way[,]" and "[h]is testimony is not reliable and is not based on his experience or any scientific process." [ECF No. 152 at 1–2]. Chetu highlights some alleged shortcomings of Mr. Reimer's report, including that he:

(1) never conducted any testing of the point of sale ("POS") system at issue to know what issues predated the claims in this case, (2) has no familiarity with the actual Paychex and Netspend applications that were requested to be integrated into the POS system, (3) never spoke to anyone from Chetu about why the POS system was antiquated or the issues that occurred with the integration of the applications, (4) never

reviewed the weekly updates that were conducted, nor the daily reports of the work being performed, and (5) most importantly (and partly due to the foregoing), has no admissible knowledge about the actual Java FX application that was taken out of the Java Development Kit and caused [Chetu] to suggest the POS at [Blue Chip] was antiquated and should be replaced.

[*Id.* at 1]. For all of these reasons, Chetu argues that Mr. Reimer's testimony should be precluded or significantly limited to avoid any of his unsupported conclusions. [*Id.* at 2].

## II.    Applicable Legal Standards for the Admissibility of Expert Opinions

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>     (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) the testimony is based on sufficient facts or data;
>     (c) the testimony is the product of reliable principles and methods; and
>     (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible only if it is both reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Expert testimony is admissible under Rule 702 if "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (internal quotation marks and citation omitted). These criteria are known as "qualification, reliability, and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Trial courts must act as "gatekeeper[s]" to ensure that expert opinions meet the standards for admissibility and that "speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). The proponent of expert testimony bears the burden

of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Hendrix ex rel. G.P. v. Evenflo Co. (Hendrix II)*, 609 F.3d 1183, 1194 (11th Cir. 2010).  Although there is overlap, courts and litigants alike "must take care not to conflate" these criteria.  *See Frazier*, 387 F.3d at 1260.

### 1.    Qualification

To meet the first *Daubert* requirement, an expert must be qualified to testify.  An expert may be qualified based on "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *Frazier*, 387 F.3d at 1261.  The standard for qualification is not stringent, and an expert need only be minimally qualified in his or her field.  *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix II*, 609 F.3d at 1183.  Qualification "is assessed in reference to the matter to which the expert seeks to testify—i.e., 'to the task at hand.'"  *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597).  "It is for that reason that expertise in one field does not qualify a witness to testify about others."  *Id.* (internal quotation marks and citations omitted).

### 2.    Reliability

An expert's methodology must be sufficiently reliable to meet the second *Daubert* requirement.  A court must assess "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue."  *Chapman*, 766 F.3d at 1306 (internal quotation marks and citation omitted).  The court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation by a genuine scientist."  *Id.*; *see also McClain*, 401 F.3d at 1244 (explaining that an "expert's assurances that he has utilized generally accepted scientific methodology are insufficient" and that a court must do more than simply take "the expert's word for it" (alteration, internal quotation marks, and citation omitted)).

In *Daubert*, the Supreme Court identified a list of factors to guide assessment of an expert's methodology:  (1) whether the expert's scientific method, technique, or theory can be objectively

6

tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the method; (4) the existence of standards and controls; and (5) whether the method, technique, or theory has been generally accepted in the scientific community.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 592–95; *Hendrix II*, 609 F.3d at 1194. These factors are meant to help with the assessment, but they are not a definitive or exhaustive checklist.  *See Kumho Tire*, 526 U.S. 137 at 151.  All five factors may not even apply each time the reliability of expert testimony is challenged.  *Id.* at 150.

A court may consider the additional factors of whether the opinion was created for the purpose of litigation and whether the expert stands to benefit financially from his or her testimony. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999); *Lust By & Through Lust v. Merrell Dow Pharms.*, Inc., 89 F.3d 594, 597 (9th Cir. 1996) (noting that an expert was a plaintiff's witness in a different case at the time he published his article and presuming he was "influenced by a litigation-driven financial incentive").  Importantly, an opinion is not reliable when there is "too great an analytical leap between the [supporting] data and the opinion proffered."  *Hendrix II*, 609 F.3d at 1194 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004); *c.f. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

A court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and whether the factors "are reasonable measures of the reliability of expert testimony."  *Kumho Tire*, 526 U.S. at 152.  But there are still limits on the court's discretion.  *See Quiet Tech DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  The court's role is not to "make ultimate conclusions as to the persuasiveness of the proffered evidence."

*Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 3.    Helpfulness

An expert's testimony must be helpful to meet the third *Daubert* requirement.  To be helpful, expert testimony must fit the facts of the case.  *McDowell*, 392 F.3d at 1298–99; *Allison*, 184 F.3d at 1312.  To do so, it must "logically advance[ ] a material aspect of the case" and "assist the trier of fact."  *McDowell*, 392 F.3d at 1299 (internal quotation marks and citation omitted).  "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  *Daubert*, 509 U.S. at 591 (internal quotation marks and citation omitted).  Expert testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" generally will not assist the trier of fact and will be excluded.  *Frazier*, 387 F.3d at 1262–63.

Just as an opinion is unreliable if it is based upon an analytical leap that is too great between the underlying information and the proffered opinion, there is not a "fit" for purposes of the helpfulness prong when "a large analytical leap must be made between the facts and the opinion." *McDowell*, 392 F.3d at 1298–99 (citing *Joiner*, 522 U.S. at 146).[1]  An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions." *Id.* at 1300.

A party's failure to establish the first or second prong obviates the need to proceed to the next prong; the proffered expert testimony is not admissible without satisfying all three prongs.  *See Hendrix II*, 609 F.3d at 1194 ("The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong." (citation omitted)).

---

[1]      Because courts consider "analytical leaps" under both the reliability and helpfulness prongs of *Daubert*, this Court considers analytical leaps under both prongs as well.

### III.    Mr. Paul Reimer

Mr. Reimer is "an expert in payment network operating rules, regulations, and industry standards." [ECF No. 100-6 at 32].  He has "vast experience with all types of payment venues including multilane POS, AFDs, ATMs, eWallets, eCommerce, payment tokens, MIT framework, interchange rate qualification, original credit transaction (OCT), security and brand tokenization, point-to-point encryption (P2Pe), PIN security, and PCI compliance."  [*Id.*].  Mr. Reimer's report provides nine opinions as detailed below, and they are hereinafter referenced in this Order by number:

1. It is my opinion that the functionality associated with the integration of the two "API's Netspend/Paychex" into The Man Shop retail POS system that were worked on by Chetu from March 2021 to May 30, 2021 (Phase 1) did not function.
2. It is my opinion that for the tasks that were identified by Chetu on June 3, 2021 as needing to be executed to deliver the new version of The Man Shop retail POS system as outlined in the "Redevelopment Outline", Chetu did not meet these requirements as of July 2022.
3. It is my opinion that The Man Shop's original retail POS system was written in a coding language that was capable of being used to support the integration of the Netspend and Paychex APIs since The Man Shop retail POS system code was based upon a Java frontend and a Node.js (JavaScript) backend.
4. It is my opinion that Chetu did not follow generally accepted software development best practices in the execution of this project.
5. It is my opinion that the information contained in the Chetu High Level Design document (HLD) and in the Chetu Detailed Design document (DDD) was insufficient to describe the scope of the approach that Chetu was intending to take with implementing the solution for The Man Shop.
6. It is my opinion that Chetu did not utilize an industry best practices application software regression testing process to assure that the software that they were developing for The Man Shop was error free.
7. The Chetu project team members repeatedly made commitments to The Man Shop to complete various components of the coding by certain dates that which were consistently missed.  In this manner Chetu demonstrated a pattern of rendering inaccurate man-day estimates to complete tasks that they had committed to, and these inaccurate estimates resulted in The Man Shop being led astray on the actual levels of effort that were required to complete these tasks.  It is my opinion that this pattern of persistently inaccurate estimates by Chetu was well outside of what can normally be expected from competent professional software development firms.
8. It is my opinion that Chetu made questionable architecture choices as the underpinning of the new POS system that Chetu convinced The Man Shop to go forth with for Phase 2 of the project to implement a new POS system for The Man Shop.
9. In my opinion Chetu appears to have engaged in software usage practices for the work that they performed for The Man Shop that did not have a reasonable justification.

[*Id.* at 16–25]. Chetu moves to preclude or limit Mr. Reimer's testimony on the basis that he "has failed to acquire the necessary knowledge and information to enable him to provide competent expert testimony in this case[,]" his "testimony will not assist the trier of fact in any way[,]" and "[h]is testimony is not reliable and is not based on his experience or any scientific process." [ECF No. 152 at 1–2]. Chetu challenges all three *Daubert* criteria with respect to Mr. Reimer: qualifications, reliability, and helpfulness. The Court will consider each in turn.

### 1.      Qualification

Chetu argues that Mr. Reimer is not qualified "due to not having obtained knowledge or information for these specific issues despite his general qualifications." [ECF No. 152 at 12]. Chetu contends that this is the case because Mr. Reimer "does not know what issues existed with the Strand POS, does not know anything about Java FX, does not know about the development that was actually ongoing, and did not inquire about the major issues including the decision to redevelop the POS." [*Id.* at 7].

The Court finds that Mr. Reimer is qualified to testify on the nine (9) opinions in his report. Opinions 1, 2, 3, and 8 focus on The Man Shop's retail POS system. [*See* ECF No. 100-6]. "Mr. Reimer is an expert in electronic payment technologies with extensive experience on advanced POS technologies." [*Id.* at 29]. He is qualified to testify on aspects related to the POS system. Opinions 4, 5, 6, 7, and 9 relate to software development. [*See id.*]. Mr. Reimer is "[e]xperienced as a software developer who has worked on both legacy payment card & banking platforms as well as on advance cloud-based solutions. Well versed in modern software standards, techniques and tools in common use today." [*Id.* at 32].

Chetu challenges Mr. Reimer on his alleged lack of knowledge related to specific issues in this case, but even if there may be facts in this case that he is less knowledgeable about (such as those related to the Strand POS or the specific software development), that does not make him unqualified

to render the proffered opinions.  Instead, that goes to the reliability of his methodology and the facts, documents, and evidence he considered in performing his analysis.  From Mr. Reimer's curriculum vitae [ECF No. 100-6 at 32–34], and having heard him testify at the hearing, it is clear to the Court that Mr. Reimer has the appropriate baseline training and experience to testify competently on the matters set forth in his opinions—matters related to POS systems and software development.  Thus, the Court finds that Mr. Reimer is qualified to testify as to his nine proffered opinions.

### 2.     Reliability and Helpfulness

Chetu argues further that Mr. Reimer's "testimony is not reliable and is not based on his experience or any scientific process," and that his "testimony will not assist the trier of fact in any way."  [ECF No. 152 at 2].  The Court will consider the reliability and/or helpfulness prongs of each opinion and will group them together for convenience and to minimize redundancy.

*     *     *

Chetu makes similar objections and arguments as to Opinions 1, 2, and 3, and these objections and arguments fail.

*Opinion 1*

Opinion 1 is that the functionality associated with the integration of the two "API's Netspend/Paychex" into The Man Shop POS system that were worked on by Chetu from March 2021 to May 30, 2021 ("Phase 1") did not function.  [ECF No. 100-6 ¶ 35].  In support of Opinion 1, Mr. Reimer states that "[t]he code that Chetu did develop and demonstrate to The Man Shop in Phase 1 was a fraction of the overall coding needed to meet The Man Shop's requirements.  As such the skills and knowledge needed to integrate the two APIs into The Man Shop's existing POS system during Phase 1 that Chetu claimed to have turned out to not be the case."  [*Id.*].

Chetu argues that Mr. Reimer's testimony on API's Netspend/Paychex is unreliable and unhelpful because "Mr. Reimer was not informed about the testing that was done at the weekly

meetings, did not learn (or ask about) the issues that predated Chetu's involvement, and had never performed an integration of these API's before." [ECF No. 152 at 8]. In its Motion, Chetu points to specific issues that Chetu alleges Mr. Reimer did not consider or about which he was not informed. However, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility … [.]" *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Mr. Reimer's report clearly identifies the sources he used to reach his opinions, and to the extent he did not consider particular sources, "[Chetu] may address [Mr. Reimer's] failure to consider certain sources on cross-examination." *Dunn v. Pascoe*, No. CV420-090, 2023 WL 1394886, at *3 (S.D. Ga. Jan. 31, 2023) (citation omitted).

The Court finds that Opinion 1 is reliable for *Daubert*/Rule 702 admissibility purposes. The Court also finds that Opinion 1 is helpful because it will help the factfinder understand the functionality associated with the integration of the two APIs (Netspend/Paychex) into The Man Shop retail POS system that were worked on by Chetu during Phase 1. Thus, Mr. Reimer may testify as to Opinion 1.

### Opinion 2

Opinion 2 by Mr. Reimer is that, as of July 2022, Chetu did not meet the requirements for the tasks identified by Chetu on June 3, 2021, as needing to be executed to deliver the new version of The Man Shop retail POS system as outlined in the "Redevelopment Outline." [ECF No. 100-6 ¶ 35]. In its Motion, Chetu argues that "any testimony by Mr. Reimer about what requirements of the 'redevelopment outline' were met is unreliable and confusing as it [is] only based on a cherry-picked subset of the worst evidence." [ECF No. 152 at 10]. This argument fails for much the same reasons as it did for Opinion 1, as they go to weight rather than admissibility. *See Carrizosa*, 47 F.4th at 1323. Mr. Reimer's report clearly identifies the sources he used to reach his opinion, and to the extent he

did not consider some evidence, "[Chetu] may address [Mr. Reimer's] failure to consider certain sources on cross-examination." *See Dunn*, 2023 WL 1394886, at *3.

The Court finds that Mr. Reimer's second opinion is reliable for *Daubert*/Rule 702 admissibility purposes.  The Court also finds that Mr. Reimer's opinion is helpful because it will help the factfinder understand Chetu's progress on the Redevelopment Outline as of July 2022.  Thus, Mr. Reimer may testify as to Opinion 2.

### Opinion 3

Mr. Reimer's third opinion is that The Man Shop's original POS system was written in a coding language (based upon a Java frontend and a Node.js (JavaScript) backend) that was capable of being used to support the integration of the Netspend and Paychex APIs.  [ECF No. 100-6 ¶ 35].  In his report, Mr. Reimer explains that "[b]oth Java and Node.js are modern software languages that can support the integration of APIs into it such as those provided by Netspend and Paychex."  [*Id.*].

In its Motion, Chetu argues that "Mr. Reimer … never showed that the APIs were capable of being integrated beyond his theoretical belief that they could have.  As he never knew any of the issues with the POS nor ever integrated these specific APIs into a POS, his testimony in this regard is unreliable and unhelpful to the trier of fact."  [ECF No. 152 at 8].  Chetu contends that Opinion 3 ignores the multitude of reasons why the two APIs did not function.  [*Id*].

As explained above for Opinions 1 and 2, these arguments again go to weight rather than admissibility.  *See Carrizosa*, 47 F.4th at 1323.  Mr. Reimer clearly identifies the basis for Opinion 3 in his report, and to the extent that he did not consider certain issues with the POS is what cross-examination will uncover.  *See Dunn*, 2023 WL 1394886, at *3.  Opinion 3 is reliable for purposes of *Daubert* and Rule 702.

The Court also finds that Mr. Reimer's opinion is helpful to the trier of fact because it will help the factfinder understand whether The Man Shop's original POS system could (or could not) support the integration of the Netspend and Paychex APIs.  Mr. Reimer may testify as to Opinion 3.

*Opinion 4*

Opinion 4 is a different kettle of fish.  Mr. Reimer's fourth opinion is that Chetu "did not follow generally accepted software development best practices in the execution of this project."  [ECF No. 100-6 ¶ 35].  According to Mr. Reimer, "the actual project management approach that Chetu did use to execute this project was not based upon a standard project management methodology such as Agile or Waterfall."  [*Id.*].  Here, Mr. Reimer clearly relies on his experience in software development to make this determination, which is not sufficient by itself.  The Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note (2000 amends.); *see also Frazier*, 387 F.3d at 1261 ("[E]xperience, standing alone, is [not] a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.").

Fundamentally with Opinion 4, Mr. Reimer has failed to explain how his experience leads to his conclusion that Chetu did not follow "generally accepted software development best practices," and he does not define or explain what "generally accepted software development best practices" even are in this context.  Despite referring to "Agile" and "Waterfall" as examples of "standard project methodology" in his report, Mr. Reimer does not say anywhere in the record why Agile or Waterfall are "the industry standard," nor does he explain what they are or why "adherence to a standard,

industry best practices-oriented project management methodology" was even needed.[2]  The Court cannot just take Mr. Reimer's word for it and must exclude Opinion 4 on the basis that it is unreliable. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### Opinion 5

In Opinion 5, Mr. Reimer states that the information contained in the Chetu High Level Design document ("HLD") and in the Chetu Detailed Design document ("DDD") was insufficient to describe the scope of the approach that Chetu was intending to take with implementing the solution for The Man Shop.  [ECF No. 100-6 ¶ 35].  According to Mr. Reimer, "[t]he initial versions of the HLD and DDD documents that were provided to The Man Shop … reflected the Phase 1 scope of work only[,]" and "updated versions of the HLD and DDD documents were never provided to The Man Shop by Chetu for the Phase 2 changes to the project, even though significant changes to the underlying design of the software being developed by Chetu were planned."  [*Id.*].

The Court is not sure of the precise reason Chetu seeks to exclude Opinion 5, as the HLD and DDD are never mentioned in Chetu's Motion.  However, to the extent that Chetu argues that Opinion 5 should be excluded on the basis that Mr. Reimer only "reviewed a subset of documents to make blanket conclusions[,]" the Court rejects that argument for the same reasons as Opinions 1, 2 and 3.  [ECF No. 152 at 1–2].  Mr. Reimer's report clearly identifies the sources he used to reach his opinion, and Chetu's argument once again goes to weight and not admissibility and the role of cross-examination.  *See Carrizosa*, 47 F.4th at 1323; *Dunn*, 2023 WL 1394886, at *3.

---

[2]     The Court reviewed Mr. Reimer's report, the parties' papers and exhibits, and fourteen (14) pages of excerpts from Mr. Reimer's deposition submitted by Chetu [ECF No. 100-7] to make this determination.  The Court notes that neither party submitted a full copy of Mr. Reimer's deposition transcript.

The Court also finds that Opinion 5 is reliable and helpful to the factfinder.  The proffered opinion deals with concrete aspects of the scope of work (information contained in the versions of the HLD and DDD) that are clearly the subject of this lawsuit, and the Opinion's weight and importance can be explored on direct and cross examination.[3]  Opinion 5 will help the factfinder understand the information Chetu shared with Blue Chip and the extent to which it described the scope of the approach that Chetu intended to take to implement the solution for The Man Shop.  Mr. Reimer may testify as to Opinion 5.

*Opinion 6*

This opinion, as presented, is best broken into two parts for purposes of *Daubert*/Rule 702 analysis.  Opinion 6 first states that Chetu did not utilize an "industry best practices application software regression testing process" to assure that the software Chetu was developing for The Man Shop was error free.  [ECF No. 100-6 ¶ 35].  Mr. Reimer clearly relies on his experience in software development to make this determination, but as explained earlier that is not sufficient by itself.  *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.); *see also Frazier*, 387 F.3d at 1261.  Mr. Reimer fails to explain how his experience leads to his conclusion that Chetu did not utilize an "industry best practices application software regression testing process" to assure that the software that they were developing for The Man Shop was error free.  Blue Chip, through Mr. Reimer, does not even explain how one can know whether an "application software regression testing process" does or does not comport with "industry best practices."  The Court cannot just take Mr. Reimer's word for it and must exclude this portion of Opinion 6.  *See Joiner*, 522 U.S. at 146.

---

[3]      Portions of Opinion 5 state that certain versions of HLD and DDD were provided to the Plaintiff, while other versions were not.  Of course, whether the HLD or DDD or any other document was actually "provided to The Man Shop" or not must be established by a fact witness.

The part of Opinion 6, however, where Mr. Reimer states that "[t]he code that Chetu did demonstrate to The Man Shop was frequently faulty and required extensive rework to remediate and additional expenses to be incurred by The Man Shop," stands on firmer ground. This portion of Opinion 6, in fact, does not appear to be solely expert testimony at all; indeed, much of this portion is based upon Mr. Reimer's own observations of the software code in this case. [ECF No. 100-6 ¶ 35].

"[W]itnesses need not testify as experts simply because they are experts—the nature and object of their testimony determines whether the procedural protections of Rule 702 apply." *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002). Federal Rule of Evidence 701 provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

"The line between the expert testimony under Fed. R. Evid. 702 … and lay opinion testimony under Fed. R . Evid. 701 … is not easy to draw." *United States v. Feliciano*, 300 F. App'x 795, 801 (11th Cir. 2008). Drawing that line with greater precision, the Eleventh Circuit has held that an FBI financial analyst's testimony was permissible lay testimony where even though "his expertise and use of computer software may have made him more efficient at reviewing … records, his review itself was within the capacity of any reasonable lay person." *United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006). The fact that Mr. Reimer is a software development expert does not automatically mean his testimony about code must be treated as expert testimony. *Cf. Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011) (noting approval of the Tenth Circuit's decision in *Davoll v. Webb*, 194 F.3d 1138 (10th Cir. 1999), where it held that that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge,

including the treatment of the party"); *United States v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008) (holding law enforcement agent's testimony was lay opinion testimony when based on his own personal observations and perceptions derived from that particular case).

Here, the Court finds that although Mr. Reimer's technical background may help him understand the code, his testimony is based on his own personal observations of the code and thus he may offer this testimony under Rule 701 to the extent his testimony is that the code Chetu demonstrated to The Man Shop was frequently faulty and required extensive rework to remediate.[4]

Opinion 6 goes on to state that the faults in the code required "additional expenses to be incurred by The Man Shop." The Court finds that this portion of the opinion is really just an argument repackaged as expert testimony and therefore not "helpful" to the trier of fact for purposes of *Daubert* and Rule 702. Plaintiff's counsel can argue this based on the evidence and does not require expert opinion.

In sum then, the Court partially excludes Opinion 6. Mr. Reimer may not testify as to the first part of Opinion 6—that Chetu did not utilize an "industry best practices application software regression testing process" to assure that the software Chetu was developing for The Man Shop was error free. Mr. Reimer also may not testify to the portion of Opinion 6 that argues that the faults in the code required additional expenses were incurred by The Man Shop. However, Mr. Reimer may

---

[4] The Court notes that to the extent that this portion of Opinion 6 is not solely based upon Mr. Reimer's own observations and technical experience, the testimony must still meet the evidentiary standards of Rule 702 and *Daubert*. *See Hotels of Deerfield, LLC v. Studio 78, LLC*, 621 F. Supp. 3d 1285, 1298 (S.D. Fla. 2022). The Court finds that this testimony is both reliable and helpful. As previously discussed with Mr. Reimer's qualifications, Mr. Reimer has many years of experience with software development and electronic payment technologies. Here, Mr. Reimer offers testimony about the software code at issue in this case based upon his own review of the software code itself. Thus, the Court finds that his testimony is reliable for Rule 702 purposes. The Court also finds that the testimony would assist the trier of fact in understanding the code and how it was faulty, which falls outside the knowledge of laypersons and thus requires expert testimony. Therefore, the Court also finds that this testimony is helpful for purposes of Rule 702.

testify as to the second part of Opinion 6—that the code that Chetu demonstrated to The Man Shop was frequently faulty and required extensive rework to remediate.

### Opinion 7

Opinion 7 must be excluded because it fails to satisfy *Daubert*'s helpfulness prong. Mr. Reimer states in Opinion 7 that "the pattern of persistently inaccurate estimates by Chetu," was well outside of what can normally be expected from competent professional software development firms. [ECF No. 100-6 ¶ 35]. The Court finds that Opinion 7 is only argument repackaged as expert testimony— and therefore not "helpful" to the trier of fact for purposes of *Daubert*/Rule 702. Under the helpfulness requirement, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63 (citation omitted) (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (observing that expert testimony is admissible if it offers something "beyond the understanding and experience of the average citizen")).

Plaintiff's counsel can argue Opinion 7 based on the evidence and does not require expert opinion. Based on what the parties have presented so far, it is not beyond the ken of the factfinder to determine whether the estimates provided by Chetu over time were inaccurate, "persistently inaccurate," or "outside of what can be expected" of a party to a contract in a breach-of-contract case. While the technical and mathematical nature of software development and computer language coding may be beyond the ken of the average citizen, whether something that is represented or produced by a party is "outside of what can be expected" according to a prior agreement is not. Thus, the Court excludes Opinion 7.

### Opinion 8

In Opinion 8, Mr. Reimer states that Chetu made "questionable architecture choices" as the underpinning of the new POS system in Phase 2 of the system implementation for The Man Shop. [ECF No. 100-6 ¶ 35].  In his report, Mr. Reimer explains the "questionable architecture choices" Chetu made.  For the reasons discussed below, the Court partially excludes this proffered opinion. Mr. Reimer may testify as to the first part of Opinion 8—that Chetu made "questionable architecture choices" as the underpinning of the new POS system.  However, Mr. Reimer may not testify as to the second part Opinion 8—his characterization that Chetu "convinced The Man Shop to go forth with Phase 2" of the implementation.

Considering the first part of Opinion 8, Chetu's Motion again does not clearly explain the reason Chetu seeks to exclude the opinion.  However, to the extent the basis for exclusion is that Mr. Reimer "never spoke to anyone from Chetu about why the POS system was antiquated or the issues that occurred with the integration of the applications," [ECF No. 152 at 1, 3], that argument is rejected for similar reasons as stated above.  *See Carrizosa*, 47 F.4th at 1323.  Also, and similarly as to the admissible portion of Opinion 6, an opinion about "questionable" software architecture choices is, in some respects here, not solely expert testimony at all; indeed, some of this portion of Opinion 8 is based upon Mr. Reimer's own perceptions and observations and use of the software code at issue in this case.  [ECF No. 100-6 ¶ 35].

To the extent Mr. Reimer did not talk to anyone at Chetu about the issues with the POS system, "[Chetu] may address [Mr. Reimer's] failure to consider certain sources on cross-examination." *Dunn*, 2023 WL 1394886, at *3.  The Court finds that the first part of Mr. Reimer's eighth opinion is reliable for *Daubert*/Rule 702 purposes.  The Court also finds that the first part of Mr. Reimer's eighth opinion is helpful to the trier of fact because it will help with understanding the choices Chetu made in designing the new POS system.  Thus, Mr. Reimer may testify as to the first part of Opinion 8 that Chetu made "questionable architecture choices" as the underpinning of the new POS system.

The second part of Opinion 8, however, is excluded for failure to satisfy *Daubert*'s helpfulness requirement. This part of Opinion 8 states "that Chetu convinced The Man Shop to go forth with for Phase 2 of the project to implement a new POS system for The Man Shop." That opinion is not helpful to the trier of fact and is beyond the capacity of Mr. Reimer to testify about. Once again, expert testimony is only admissible "if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63. At the most basic level, no expert witness can testify that Chetu "convinced the Man Shop" to do anything. Instead, this second part of Opinion 8 is something that Plaintiff's counsel can argue inferentially—if sufficient evidence is put before the trier of fact in the form of non-expert witness testimony or other documents or exhibits that otherwise satisfy the Federal Rules of Evidence.

Thus, the Court partially excludes Opinion 8. Mr. Reimer may testify as to the first part of Opinion 8—that Chetu made "questionable architecture choices" as the underpinning of the new POS system. However, Mr. Reimer may not testify as to the second part of Opinion 8 regarding Chetu "convincing" The Man Shop to go forth with Phase 2.

### Opinion 9

Mr. Reimer's ninth opinion fares the same as Opinions 1, 2, 3, and 5. In Opinion 9, Reimer opines that Chetu "appears to have engaged in software usage practices . . . that did not have a reasonable justification." [ECF No. 100-6 ¶ 35]. According to Reimer, "[t]hrough spot checks of the open source and proprietary software code modules that Chetu used to enhance The Man Shop retail POS system, and using standard diff utilities, it appears that some of these modules were utilized without adherence to posted licensing terms, without proper attribution, and possibly in violation of licensing agreements." [*Id.*]. In particular, Mr. Reimer notes that "the proprietary StarPrint SDK (https://github.com/star-micronics/StarPRNTSDK-Windows-Desktop) was copied and used as the

BlueChipAlliance.Desktop module, with minor changes to the code; not including deleted sample files, less than 1000 lines of changes were made to the code files." [*Id.*].

The Court is not precisely sure why Chetu seeks to exclude Opinion 9, as software usage practices are never mentioned in Chetu's Motion. However, to the extent that Chetu argues that Opinion 9 should be excluded on the basis that Mr. Reimer only "reviewed a subset of documents to make blanket conclusions[,]" the Court rejects that argument for the same reasons as Opinions 1, 2, 3, and 5. [ECF No. 152 at 1–2]. Mr. Reimer's report clearly identifies the sources he used to reach his opinion, and he notes that he performed "spot checks of the open source and proprietary software modules that Chetu used[.]" [ECF No. 100-6 ¶ 35]. Furthermore, Chetu's argument once again goes to weight and not admissibility and the role of cross-examination. *See Carrizosa*, 47 F.4th at 1323; *Dunn*, 2023 WL 1394886, at *3.

Opinion 9 is reliable and helpful to the factfinder for *Daubert*/Rule 702 purposes; the proffered opinion deals with software usage practices that Chetu engaged in for the work it performed for Blue Chip, which is the foundation for any work product that Chetu was developing for Blue Chip. The Opinion's weight and importance can be explored on direct and cross examination. Opinion 9 will help the factfinder understand the software usage practices Chetu engaged in when working on Blue Chip's software application. Mr. Reimer may testify as to Opinion 9.

## IV.    Conclusion

It is hereby **ORDERED AND ADJUDGED** that Chetu's Motion to Preclude or Limit the Expert Testimony of Paul Reimer [**ECF No. 152**] is **GRANTED IN PART and DENIED IN PART**.

1. Mr. Reimer's report [ECF No. 100-6] is partially excluded.

2. Mr. Reimer may testify as to Opinion 1, Opinion 2, Opinion 3, Opinion 5, and Opinion 9 in full.

3.   Mr. Reimer may not testify as to the first part of Opinion 6 that Chetu did not utilize an industry best practices application software regression testing process to assure that the software Chetu was developing for The Man Shop was error free.  Mr. Reimer also may not testify to the portion of Opinion 6 that argues that the faults in the code required additional expenses were incurred by The Man Shop.  However, Mr. Reimer may testify as to the second part of Opinion 6 that it is his opinion that the code that Chetu did demonstrate to The Man Shop was frequently faulty and required extensive rework to remediate and additional expenses to be incurred by The Man Shop.

4.   Mr. Reimer may testify as to the first part of Opinion 8 that Chetu made "questionable architecture choices" as the underpinning of the new POS system.  However, Mr. Reimer may not testify as to the second part of Opinion 8 regarding Chetu "convincing The Man Shop" to go forth with Phase 2.

5.   Mr. Reimer may not testify as to Opinion 4 and Opinion 7.

**DONE AND ORDERED** in the Southern District of Florida on January 8, 2025.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc:      counsel of record